EFILED Document
CO Denver County District Court 2nd JD
Filing Date: Dec 19 2012 08:36PM MST
Filing ID: 48526214
Review Clerk: Matthew Palmer

| | |
|---|---|
| DISTRICT COURT,<br>CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street, Room 256<br>Denver, CO 80202 | |
| **Plaintiffs**: P&A SUBS, INC., BAHMAN POURALI, and MARYAM SHAHBAZ.<br><br>v.<br><br>**Defendants**: QFA ROYALTIES LLC; QUIZNO'S FRANCHISING II LLC; QCE FINANCE LLC f/k/a QCE PARENT LLC; THE QUIZNO'S MASTER LLC; QIP HOLDER LLC; TQSC II LLC f/k/a TQSC LLC; QCE HOLDING LLC; QZ FINANCE LLC; QCE INCENTIVE LLC; QCE LLC; QUIZNOS FINANCE LLC; QAFT, INC.; AMERICAN FOOD DISTRIBUTORS LLC; SOURCE ONE DISTRIBUTION LLC f/k/a NATIONAL RESTAURANT SUPPLY DISTRIBUTION LLC; S&S EQUIPMENT COMPANY LLC; BA-BING! LLC f/k/a SOURCE ONE SYSTEMS LLC; CHAIN MANAGEMENT SYSTEMS LLC; KINETIC SOURCING SOLUTIONS LLC f/k/a U.S. FULFILLMENT LLC; CONTINENTAL LENDING GROUP LLC; CLG LEASING LLC; THE CERVANTES HOLDING COMPANY; CERVANTES CAPITAL LLC; CERVANTES MASTER LLC; RICHARD E. SCHADEN; RICHARD F. SCHADEN; PATRICK E. MEYERS; STEVEN B. SHAFFER; SYSTEM SERVICES OF AMERICA, INC. f/k/a McCABE'S QUALITY FOODS, INC.; SERVICES GROUP OF AMERICA, INC.; MCLANE COMPANY, INC.; and JOHN DOES 1–50. | Δ FOR COURT USE ONLY Δ<br>_____<br><br>Case No.:<br><br>Courtroom: |

| | |
|---|---|
| **Attorneys for Plaintiffs**<br>Jeffrey Cohen, Esq. #10876<br>Leslie Eaton, Esq. #17791<br>Scott Humphreys, Esq. #41723<br>Ballard Spahr LLP<br>1225 17th Street, Suite 2300<br>Denver, CO  80202<br>Phone:  303-292-2400<br>Facsimile:  303-296-3956<br>cohenj@ballardspahr.com<br>eaton@ballardspahr.com<br>humphreyss@ballardspahr.com | |
| **COMPLAINT AND JURY DEMAND** ||

DMWEST #9515037 v1

## TABLE OF CONTENTS

CASE SUMMARY...................................................................................................5
JURISDICTION AND VENUE.............................................................................8
PARTIES..................................................................................................................8
GENERAL ALLEGATIONS.................................................................................24
DEFENDANTS ARE ESTOPPED FROM  ASSERTING CERTAIN DEFENSES...............47
FIRST CLAIM FOR RELIEF: VIOLATIONS OF THE COLORADO
      ORGANIZED CRIME CONTROL ACT (C.R.S. § 18-17-101 et seq.).......................50
SECOND CLAIM FOR RELIEF: VIOLATIONS OF THE COLORADO
      ORGANIZED CRIME CONTROL ACT (C.R.S. § 18-17-101 et seq.).......................52
THIRD CLAIM FOR RELIEF: VIOLATIONS OF THE COLORADO
      ORGANIZED CRIME CONTROL ACT (C.R.S. § 18-17-101 et seq.).......................54
FOURTH CLAIM FOR RELIEF: VIOLATION OF THE COLORADO
      CONSUMER PROTECTION ACT (C.R.S. § 6-1-101 et seq.)....................................56
FIFTH CLAIM FOR RELIEF: VIOLATION OF THE CONSUMER
      PROTECTION ACT (C.R.S. § 6-1-101 et seq.)............................................................58
SIXTH CLAIM FOR RELIEF: CONSPIRACY TO VIOLATE THE COLORADO
      CONSUMER PROTECTION ACT (C.R.S. § 6-1-101 et seq.)....................................59
SEVENTH CLAIM FOR RELIEF: AIDING AND ABETTING VIOLATIONS OF
      THE COLORADO CONSUMER PROTECTION ACT
      (C.R.S. § 6-1-101 et seq.)..............................................................................................60
EIGHTH CLAIM FOR RELIEF: BREACH OF CONTRACT ..............................................61
NINTH CLAIM FOR RELIEF:  BREACH OF CONTRACT  (Breach of The
      Implied Covenant  of Good Faith And Fair Dealing)................................................62
TENTH CLAIM FOR RELIEF:  BREACH OF CONTRACT  (Breach of The
      Implied Covenant  of Good Faith And Fair Dealing)................................................64
ELEVENTH CLAIM FOR RELIEF: UNJUST ENRICHMENT ...........................................65
TWELFTH CLAIM FOR RELIEF: FRAUD IN THE INDUCEMENT...............................66
THIRTEENTH CLAIM FOR RELIEF: CONSPIRACY TO COMMIT FRAUD IN
      THE INDUCEMENT .....................................................................................................67
FOURTEENTH CLAIM FOR RELIEF: AIDING AND ABETTING FRAUD IN
      THE INDUCEMENT .....................................................................................................68
FIFTEENTH CLAIM FOR RELIEF: PROMISSORY FRAUD..............................................69
SIXTEENTH CLAIM FOR RELIEF: CONSPIRACY TO COMMIT
      PROMISSORY FRAUD .................................................................................................70
SEVENTEENTH CLAIM FOR RELIEF:  AIDING AND ABETTING
      PROMISSORY FRAUD .................................................................................................71

EIGHTEENTH CLAIM FOR RELIEF: FRAUD (By False Representations) ...................... 72

NINETEENTH CLAIM FOR RELIEF: FRAUD (By Nondisclosure and Concealment) .................................................................................................. 73

TWENTIETH CLAIM FOR RELIEF: NEGLIGENT MISREPRESENTATION .................. 74

TWENTY-FIRST CLAIM FOR RELIEF: DECLARATORY JUDGMENT ("Illusory Contract") ........................................................................................ 75

TWENTY-SECOND CLAIM FOR RELIEF: DECLARATORY JUDGMENT ("Unconscionable Contract") ................................................................. 76

TWENTY-THIRD CLAIM FOR RELIEF: VIOLATIONS OF COLORADO'S CIVIL THEFT ACT, (C.R.S. § 18-4-405, et seq.) ......................................... 77

TWENTY-FOURTH CLAIM FOR RELIEF: CONSPIRACY TO COMMIT CIVIL THEFT IN VIOLATION OF COLORADO'S CIVIL THEFT STATUTE (C.R.S. § 18-4-405, et seq.) ........................................................................ 78

TWENTY-FIFTH CLAIM FOR RELIEF: AIDING AND ABETTING CIVIL THEFT IN VIOLATION OF COLORADO'S CIVIL THEFT STATUTE (C.R.S. § 18-4-405, et seq.) ........................................................................ 79

TWENTY-SIXTH CLAIM FOR RELIEF: TRANSFERS MADE IN VIOLATION OF COLORADO'S UNIFORM FRAUDULENT TRANSFER ACT (C.R.S § 38-8-101 et seq.) ............................................................................... 80

TWENTY-SEVENTH CLAIM FOR RELIEF: CONSPIRACY TO TRANSFER PROPERTY IN VIOLATION OF COLORADO'S UNIFORM FRAUDULENT TRANSFER ACT (C.R.S § 38-8-101 et seq.) .................................. 81

TWENTY-EIGHTH CLAIM FOR RELIEF: AIDING AND ABETTING TRANSFERS IN VIOLATION OF COLORADO'S UNIFORM FRAUDULENT TRANSFER ACT (C.R.S § 38-8-101 et seq.) .................................. 82

PRAYER FOR RELIEF ................................................................................................ 83

JURY DEMAND ......................................................................................................... 84

Plaintiffs P&A Subs, Inc., Bahman Pourali, and Maryam Shahbaz (collectively "**Plaintiffs**"), through undersigned counsel, Ballard Spahr LLP, hereby allege as follows:

## CASE SUMMARY

1.      This case is about a rogue franchisor and its web of affiliated entities, owners, and individuals ("**Quiznos**") who, through a fraudulent scheme based on deceptive and illegal business practices, has stolen hundreds-of-millions-of dollars from its franchisees, including Plaintiffs, leaving them in financial ruin.

2.      Quiznos' fraudulent scheme, though relatively complex, can be distilled into five primary components.

3.      **First**, and most important, in the early 2000's Quiznos began to develop what Denver District Court Judge Robert L. McGahey, Jr. would later call the "cash generating engine of AFD."  Not content to generate its profits from royalties, Quiznos devised a way to steal hundreds-of-millions-of dollars from its franchisees each year by creating pass-through companies, such as Defendant American Food Distributors LLC ("**AFD**"), that added significant hidden mark-ups to the food, paper, and other supplies that the franchisees were contractually obligated to buy from Quiznos (the "**Mandated Essential Goods**").  To keep AFD and its mark-ups hidden, Quiznos conspired with the Defendants that distributed the Mandated Essential Goods to the franchisees (the "**Distributor Defendants**") to intentionally omit the AFD mark-ups from invoices given to the franchisees.  In essence, the Distributor Defendants acted as a fence and front man that kept AFD and its scheme hidden from the franchisees and third parties generally. The hidden mark-ups, which are the keystone of Quiznos' fraudulent scheme, have generated massive profits for Quiznos while simultaneously driving franchisees to financial ruin.  Indeed, by the mid-2000s, AFD was making more than $100 million in profit each year while the majority of Quiznos franchisees were losing money or barely breaking even.  In the words of former Quiznos' Regional Vice President Mark Maximovich, with the creation of AFD, Quiznos underwent a "regime change" by morphing from a legitimate franchise operation focused on making profits through royalties to a food distribution operation focused solely on increasing the number of franchisees to whom it could sell overpriced food, equipment, services and supplies.

4.      **Second**, to grow its profits from the hidden mark-ups, Quiznos set out to increase the number of franchisees.  Quiznos aggressively signed up new franchisees despite knowing that most of its existing franchisees were unprofitable and that such unfettered expansion would encroach upon existing stores, harming the franchisees' bottom line.  To entice new franchisees, Quiznos trained its sales team to aggressively market the "American Dream" of business ownership to unsophisticated consumers using high-pressure sales techniques, fraudulent misrepresentations, material

5

omissions, and outright lies.  The most egregious lie was the false promise in Item 8 of Quiznos' federally-mandated Uniform Franchise Offering Circulars ("**UFOCs**") that Quiznos and its affiliates would "negotiate purchase arrangements with suppliers for the benefit of Franchisees, which often include volume discounts."  Likewise, Quiznos' salespersons frequently told prospective franchisees that "your success is our success" and claimed that one of the most significant benefits of joining Quiznos was the bulk purchasing power of the Quiznos system.  These fraudulent sales methods worked – under the supervision of Defendant Steven B. Shaffer, Quiznos grew from around 1,000 franchisees in 2000 to more than 5,000 franchisees by 2006.

5.      **Third**, with the number of franchisees growing rapidly, Quiznos artificially increased the amount of Mandated Essential Goods the franchisees would be required to purchase from AFD by drastically increasing couponing and other discount programs.  Knowing that the franchisees contractually were required to honor coupons without receiving any reimbursement, Quiznos purposefully increased coupons for free and discounted food in order to push more Mandated Essential Goods out the door to the end consumer, thereby increasing AFD's hidden profits from the increasing amount of Mandated Essential Goods that the franchisees were required to buy from Quiznos.

6.      **Fourth**, once ensnared, Quiznos continued its practice of intentionally lying to and misleading the franchisees so as to prevent them from discovering the hidden mark-ups and suing to enforce their legal rights.  Indeed, contrary to what it knew to be true, Quiznos denied on several occasions that it was overcharging the franchisees for the Mandated Essential Goods.  For example, in July 2005, in response to franchisees' complaints that food prices were too high, Quiznos sent to its franchisees the "White Paper," which flatly denied such allegations and told the franchisees that complaints about high food prices were based on "misinformation."  Likewise, upon information and belief, starting in 2006 and continuing until Plaintiffs sold their store in early 2009, Quiznos sent memos to its franchisees, including Plaintiffs, proclaiming that Quiznos was "working together with Franchise Owners to grow profitably by leveraging our restaurants' collective purchasing power."

7.      **Finally**, upon information and belief, in the mid-2000s, as profits from the hidden mark-ups reached more than $100 million each year, Defendants Richard E. Schaden, Richard F. Schaden, Patrick E. Meyers, Steven B. Shaffer, and the Cervantes Defendants (the "**Schaden Ownership Group**") set in motion a plan to fraudulently transfer hundreds-of-millions of dollars to themselves, leaving Quiznos insolvent and the franchisees on the path to certain failure.  In 2005 and 2006, the Schaden Ownership Group authorized a number of capital transactions, including a leveraged buyout and dividend recapitalization, which ultimately left Quiznos more than $870 million in debt.  Shortly thereafter, the Schaden Ownership Group transferred nearly all the proceeds of

the $870 million debt to themselves as "member distributions" without providing Quiznos any consideration in return. The Schaden Ownership Group made these transfers with the actual intent to defraud franchisees, knowing that the transfers would leave Quiznos insolvent and unable to service or repay the $870 million debt without charging franchisees the hidden mark-ups in perpetuity. The Schaden Ownership Group also made the transfers to prevent the franchisees from recovering on any judgment rendered against Quiznos as the result of lawsuits similar to this action.

8.      Plaintiffs, like most franchisees, attempted for years to stay afloat and make good on their contractual promises until they finally were no longer able to withstand the financial drain on their savings. Plaintiffs represent the typical franchisee who routinely pumped money into its franchise (and Quiznos' pockets) and has suffered astronomical losses as a result of the rigged and one-sided system.

9.      It should come as no surprise that after more than a decade of running its parasitic scheme, Quiznos has sucked most of its franchisees dry and its remaining franchisees are nearly tapped out. In fact, Quiznos' scheme played out just as would be expected. From 2000 to 2006, Quiznos grew exponentially from nearly 1,000 franchisees to more than 5,000 franchisees. However, in the six years since the Schaden Ownership Group burdened the company with the $870 million debt and absconded with the proceeds, the Quiznos system has rapidly dwindled to approximately 1,500 franchisees at present. The number of franchisees continues to fall due to the ongoing fraudulent practices alleged in this Complaint.

10.     Though unknown to Plaintiffs until late 2012, it is now clear that the Defendants named in this action ruthlessly pursued the fraudulent scheme alleged above to Plaintiffs financial and emotional detriment.

11.     Though unknown to Plaintiffs until late 2012, it is now clear that the Defendants named in this action ruthlessly pursued the fraudulent scheme alleged above and more specifically in this Complaint to Plaintiffs' financial and emotional detriment.

12.     To redress the serious economic and emotional injury imposed upon them, Plaintiffs now bring this action alleging claims for: (a) violations of the Colorado Organized Crime Control Act, C.R.S. § 18-17-104 et seq.; (b) violations of the Colorado Consumer Protection Act, C.R.S. § 6-1-101 et. seq.; (c) breach of contract; (d) breach of the implied covenant of good faith and fair dealing; (e) unjust enrichment; (f) fraud in the inducement; (g) promissory fraud; (h) fraud by false representations and concealment; (i) negligent misrepresentation; (j) declaratory judgment; (k) violations of Colorado's "Civil Theft" statute, C.R.S. § 18-4-405 et seq.; and (l) fraudulent transfers in violation of Colorado's Uniform Fraudulent Transfer Act, C.R.S. § 38-8-105 et seq.

## JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over each Defendant pursuant to Colo. Rev. Stat. §§ 13-1-124(1)(a) & (b) because each Defendant transacts business in the State of Colorado and has committed tortious acts within this state.  Each Defendant also maintains continuous and systemic business contacts with the State of Colorado or is subject to personal jurisdiction pursuant to Colorado's Long-Arm Statute, C.R.S. § 13-1-124.  This Court also has personal jurisdiction over each of the individual Defendants because they live and reside in Colorado.

14.     Venue is proper in this Court pursuant to C.R.C.P. 98(a) & (c).

15.     Each franchise agreement provides that it "shall be interpreted under the laws of Colorado," that any dispute will be "governed and determined in accordance with the substantive laws of Colorado," and that the exclusive venue for any claims is the District Court for the City and County of Denver, Colorado, or the United States District Court for the District of Colorado.  The parties to the franchise agreements expressly waived any objection to personal jurisdiction or venue in these courts.

## PARTIES

A.     <u>Plaintiffs</u>

16.     Plaintiff P&A Subs, Inc. ("**P&A Subs**") is a California corporation with its principal place of business at 22641 Hazetine, Mission Viejo, California.  P&A Subs, Inc. was dissolved in 2009.

17.     Plaintiffs Bahman Pourali ("**Pourali**") and his wife Maryam Shahbaz ("**Shahbaz**") are adult individuals and citizens of the State of California.  Pourali and Shahbaz reside together at 22641 Hazeltine, Mission Viejo, California 92692

18.     Pourali and Shahbaz each maintained a 50% ownership interest in P&A Subs prior to its dissolution.

19.     On or about March 17, 2003, Pourali executed a Franchise Agreement for the operation of Quiznos Store No. 5094, which Quizno's Franchising LLC[1] countersigned on April 24, 2003.

---

[1] As explained in paragraphs 25-28, Quizno's Franchising LLC was the predecessor-in-interest to Defendant QFA Royalties LLC, who is the current franchisor for all Quiznos franchise agreements.

20.    The Franchise Agreement for Store 5094 contains a "Guaranty and Assumption of Franchisee's Obligations" which purports to make Pourali and Shahbaz personally liable to Quiznos for all obligations arising under the Franchise Agreement.

21.    On or about January 10, 2004, Pourali transferred his interest in the Franchise Agreement for Store No. 5094 to P&A Subs.

22.    Plaintiffs opened Store 5094 on or about May 3, 2004, located at 3533 East Chapman, Orange, California 92869.

23.    Plaintiffs operated Store 5094 from May 3, 2004, until it was sold to a non-party franchisee on or about January 18, 2009.

**B.    Defendants**

24.    Quiznos has represented in its UFOCs that "there is common control of all entities in the QUIZNOS system."  These entities, only some of which are named as Defendants in this action, also share common officers and directors.  In this Complaint, "**Quiznos**" refers to the web of affiliated companies, corporations and limited liability companies that, acting together or separately, control and manage the Quiznos franchise system.

**i.    QFA Royalties, LLC ("QFA")**

25.    Defendant QFA is a Delaware limited liability company with its principal place of business at 1001 17th Street, Suite 300, Denver, Colorado 80202.

26.    QFA has been the franchisor of the Quiznos system and has been offering Franchise Agreements since March 28, 2008.

27.    QFA assumed all Franchise Agreements that were effective on or prior to March 27, 2008.

28.    QFA's predecessors in interest include The Quizno's Corporation ("**TQC**") (1991 – Dec. 2000), The Quizno's Franchise Company ("**TQFC**") (Dec. 2000 – Sept. 2002), Quizno's Franchising LLC ("**QF**") (July 2002 – Jan. 2005), and Quizno's Franchising II LLC ("**QFII**") (Feb. 2005 – March 2008).

29.    QFA is managed by Defendant QIP Holder LLC, QFA's sole member.

30.    QFA maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

9

### ii.     Quizno's Franchising II LLC ("QFII")

31.     Defendant QFII is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202.

32.     QFII sold Quiznos franchises from February 2005 – March 2008.

33.     From February 2005 – March 2008, QFII (together with Defendant TQSC II, LLC) was the franchisor responsible for franchise relations, and was a wholly-owned subsidiary of defendant QFA.

34.     QFII maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### iii.    QCE Finance LLC f/k/a QCE Parent LLC ("QCE Finance")

35.     Defendant QCE Finance is a Delaware limited liability company with its principal place of business at 1001 17th Street, Suite 300, Denver, Colorado 80202.

36.     In connection with debt restructuring activities completed in 2012, non-party QCE Finance LLC (an affiliated entity formed in December 2005) merged with and into QCE Parent LLC, a Delaware limited liability company formed in December 2011.  As a result of the merger, QCE Parent LLC changed its name to QCE Finance LLC.

37.     Quiznos represents in its FDDs that QCE Finance is the "ultimate parent" of Defendant QFA.

38.     QCE Finance is also the sole and controlling member of Defendant QCE LLC, which controls the day-to-day operations of the Quiznos brand and those entities and affiliates responsible for such operations in the United States and Canada.

39.     Non-party Avenue Capital Group and its affiliates currently hold approximately 72.6% of the equity and voting power of QCE Finance.

40.     QCE Finance maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### iv.      The Quizno's Master LLC ("TQM")

41.      Defendant TQM is a Delaware limited liability company with its principal place of business at 1001 17th Street, Suite 300, Denver, Colorado 80202.

42.      From May 2002 until November 2004, TQM owned and licensed Quiznos' intellectual property, including its trademarks, copyrights, and confidential information (the "**QUIZNOS IP**") to the various Quiznos entities in their operation and control of the Quiznos franchise system.

43.      TQM was at certain material times the parent of TQFC and an affiliate of QF.

44.      TQM also owns all of the membership units in Defendant American Food Distributors LLC.

45.      TQM maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### v.      QIP Holder LLC ("QIP")

46.      Defendant QIP is a Delaware limited liability company with its principal place of business at 1001 17th Street, Suite 300, Denver, Colorado 80202.

47.      In November 2004, TQM transferred its interests in the QUIZNOS IP to QIP.

48.      QIP owns all of the membership units in QFA, which oversees franchise relations for the Quiznos Brand.

49.      In February 2005, QIP licensed all of the QUIZNOS IP to QFA for a 99-year term.

50.      QIP maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### vi.      TQSC II LLC f/k/a/ TQSC LLC ("TQSC II")

51.      Defendant TQSC II is a Delaware limited liability company with its principal place of business at 1001 17th Street, Suite 300, Denver, Colorado 80202.

52.      QFA maintains "Franchise Servicing Agreements" with TQSC II as it did with TQSC LLC, TQSC II's predecessor-in-interest.

53.      Pursuant to those Franchise Servicing Agreements, TQSC II is responsible for administering QFA's obligations under the franchise agreements, including managing

the Quiznos System, marketing and offering new and successor Franchise Agreements, assisting Franchisees generally, and implementing quality assurance programs.

54.     QFA pays TQCS II franchise servicing fees for these services.

55.     TQSC II maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### vii.     QCE Holding LLC ("QCE Holding")

56.     Defendant QCE Holding is a Delaware limited liability company with its principal place of business at 1001 17th Street, Suite 300, Denver, Colorado 80202.

57.     QCE Holding is the "ultimate parent" of all the Quiznos entities, including Defendant AFD.

58.     Upon information and belief, prior to non-party Avenue Capital Group's acquisition of Quiznos, the majority interest in QCE Holding was owned or controlled by Defendants The Cervantes Holding Company, Cervantes Capital LLC, and/or Cervantes Master LLC (collectively, the "**Cervantes Defendants**").  Minority equity positions in QCE Holding were held by non-parties J.P. Morgan Partners, J.P. Morgan Partners Global Investors, L.P., J.P. Morgan Partners Global Investors (Selldown), L.P., and Turn Works, Inc. (collectively "**J.P. Morgan**"), which in turn relied upon non-party CCMP Capital Advisors LLC to manage their equity interest.

59.     QCE Holding maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### viii.     QZ Finance LLC ("QZF")

60.     Defendant QZF is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202.

61.     Upon information and belief, QZF assisted Quiznos in obtaining a $250 million loan that was securitized by future royalties from Quiznos franchisees.  For a limited time in or about February 2005, QZF obtained by assignment all rights and liabilities in the franchise agreements previously executed by TQFC and QF to facilitate that securitization.

62.     QZF maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### iv.      QCE Incentive LLC ("QCE Incentive")

63.      Defendant QCE Incentive is a Delaware limited liability company with its principal place of business at 1001 17th Street, Suite 200, Denver, Colorado 80202.

64.      QCE Incentive manages a stock option plan designed to retain and reward certain Quiznos employees, officers, directors and other persons involved in operating QCE Holding and to align the interests of those individuals with those holding equity positions in QCE Holding and its affiliates.

65.      QCE Incentive is controlled by the board of directors of QCE Holding.

66.      Prior to non-party Avenue Capital Group's acquisition of Quiznos, QCE Incentive was owned by one or more of the Cervantes Defendants and J.P. Morgan.

67.      QCE Incentive maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### x.      QCE LLC ("QCE")

68.      Defendant QCE is a Delaware limited liability company with its principal place of business at 1001 17th Street, Suite 200, Denver, Colorado 80202.

69.      QCE is a consolidated holding company that owns all of the businesses that comprise the Quiznos brand, including, without limitation, all of the corporate Defendants named in this action except the Cervantes Defendants, QCE Holding, QCE Incentive, and QCE Finance.

70.      QCE maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### xi.      Quiznos Finance LLC ("Q Finance")

71.      Defendant Q Finance is a Delaware limited liability company with its principal place of business at 1515 Arapahoe Street, Tower One, 10th Floor, Denver, Colorado 80202.

72.      Q Finance owns an equity position in QCE Holding.

73.      Q Finance maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

DMWEST #9515037 v1

### xii.     QAFT, Inc. ("QAFT")

74.     Defendant QAFT is a Delaware corporation with its principal place of business at 1001 17th Street, Suite 300, Denver, Colorado 80202.

75.     QAFT is the Trustee for the national, regional and local advertising funds collected by Quiznos from its franchisee on a weekly basis, including the "National Marketing Fund Trust" and the "Regional Advertising Program Trust."

76.     QAFT's predecessor trustees were non-party TQFC and Defendant TQM.

77.     QAFT maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### xiii.     American Food Distributors LLC ("AFD")

78.     Defendant AFD is a Delaware limited liability company with its principal place of business at 1001 17th Street, Suite 200, Denver, Colorado 80202.

79.     AFD was created in or about 2000 at the direction of Defendants Rick Schaden, Dick Schaden, Meyers, and Shaffer.

80.     Pursuant to a Products License Agreement with QFA, AFD serves as a wholesaler of Quiznos' branded and nonbranded restaurant products to unaffiliated third-party distributors who in turn sell the products to franchisees pursuant to mandatory supply obligations imposed by Quiznos through the Franchise Agreements.

81.     Defendant TQM owns 100% of the membership units in AFD, and TQM is a wholly owned subsidiary of Defendant QCE Holding.

82.     AFD maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### xiv.     Source One Distribution LLC f/k/a National Restaurant Supply
###            Distribution LLC ("Source One")

83.     Defendant Source One is a Delaware limited liability company with its principal place of business at 540 Gallatin Place N.W., Albuquerque, New Mexico 87121.

84.     Source One was created in 2002.

85.     Source One sells restaurant equipment and building materials, architectural services, third party point-of-sale and credit card processing systems, uniforms,

DMWEST #9515037 v1

supplies, printing and other services to Plaintiffs pursuant to the mandatory supply obligations imposed on Plaintiffs by their franchise agreements.

86.     Defendant S&S Equipment Company LLC owns all of the membership units in Source One.

87.     Previously, S&S Equipment Company LLC was a joint venturer in Source One with National Restaurant Supply, Inc., a non-party unaffiliated with Quiznos.

88.     Source One works in conjunction with Defendants Ba-Bing! LLC and Kinetic Sourcing Solution LLC in providing products and services to Plaintiffs.

89.     Source One maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### xv.     S&S Equipment Company LLC ("S&S Equipment")

90.     Defendant S&S Equipment is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202.

91.     Upon information and belief, S&S Equipment is owned by Defendant Richard F. Schaden and non-party Restaurant Retail Management LLC, which is controlled by Defendant Richard E. Schaden and non-party The Sandwich Trust.

92.     S&S Equipment maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### xvi.     Ba-Bing! LLC f/k/a Source One Systems LLC ("Ba-Bing")

93.     Defendant Ba-Bing is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202.

94.     Ba-Bing sells non-party point-of-sale cash registers and credit card processing systems to Plaintiffs pursuant to mandatory supply obligations imposed on the franchisee by Quiznos through the franchise agreements.

95.     Ba-Bing maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### xvii.   Chain Management Systems LLC ("Chain Management")

96.     Defendant Chain Management is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202.

97.     Chain Management owns all of the membership units in Ba-Bing and has benefited financially from its association in the scheme outlined in this Complaint.

98.     The membership units in Chain Management are owned by non-parties RFS Investments LLC (controlled by Defendant Richard F. Schaden), PEM LLC (controlled by Defendant Patrick E. Meyers), Leading Brands LLC (now known as Defendant Source One LLC), FHS LLC (controlled by Frederick H. Schaden, the brother of Defendant Richard E. Schaden), and Quiznos' former Chief Financial Officer John Gallivan.

99.     Chain Management maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### xviii.   Kinetic Sourcing Solutions LLC f/k/a U.S. Fulfillment LLC ("Kinetic Sourcing")

100.    Defendant Kinetic Sourcing is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202.

101.    Kinetic Sourcing is the official supplier of store products and services used by Quiznos franchisees, including such things as office supplies, payroll services, pest control services through Terminix, logo wear, payroll processing services through ADP, laundry and cleaning services through Cintas, accounting services, and promotional, advertising and print items.

102.    Kinetic Sourcing is owned by non- parties Restaurant Retail Management LLC (controlled by Defendant Richard E. Schaden) and RFS Investments LLC (controlled by Defendant Richard F. Schaden).

103.    Kinetic Sourcing maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### xix.    Continental Lending Group LLC ("Continental")

104.    Defendant Continental is a Delaware limited liability company with its principal place of business at 1001 17th Street, Suite 300, Denver, Colorado 80202.

105.    From March 2002 until August 2007, Continental maintained a contract with Muzak® LLC for the mandatory provision of music to Quiznos franchised restaurants. Continental assigned that contract to TQSC II in or about August 2007.

106.    Continental also lent money to franchisees.

16

107.     Continental maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### xx.     CLG Leasing LLC ("CLG")

108.     Defendant CLG is a Delaware limited liability company with its principal place of business at 1001 17th Street, Suite 200, Denver, Colorado 80202.

109.     CLG served as the mandatory leasing agent of certain point-of-purchase cash register systems to Quiznos' franchisees, including the Aloha and QPOS systems. Defendant Continental owns all of CLG's membership units.

110.     CLG also leased credit card processing machines to the franchisee.

111.     CLG maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado..

### xxi.     The Cervantes Holding Company ("Cervantes Holding")

112.     Defendant Cervantes Holding is a Delaware corporation with its principal place of business at 1515 Arapahoe Street, Tower One, Tenth Floor, Denver, Colorado 80202.

113.     Cervantes Holding is under common control with the Quiznos entities and has acted in concert with them.

114.     Defendants consider Cervantes Holding to be an affiliate of Quiznos for certain purposes.

115.     Upon information and belief, Cervantes Holding maintains a major interest in one or more Quiznos entities, including QCE Holding.

116.     Cervantes Holding maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### xxii.     Cervantes Capital LLC ("Cervantes Capital")

117.     Defendant Cervantes Capital is a Delaware limited liability company with its principal place of business at 1515 Arapahoe Street, Tower One, Tenth Floor, Denver, Colorado 80202.

118.     Cervantes Capital is under common control with the Quiznos entities and has acted in concert with them.

119.   Upon information and belief, Cervantes Capital maintains a majority interest in one or more Quiznos entities, including QCE Holding.

120.   Cervantes Capital maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### xxiii. Cervantes Master LLC ("Cervantes Master")

121.   Defendant Cervantes Master is a Delaware limited liability company with its principal place of business at 1515 Arapahoe Street, Tower One, Tenth Floor, Denver, Colorado 80202.

122.   Cervantes Master is under common control with the Quiznos entities and has acted in concert with them.

123.   Upon information and belief, Cervantes Master maintains a majority interest in one or more Quiznos entities, including QCE Holding.

124.   Cervantes Master maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

### xxiv.   Richard E. Schaden ("Rick Schaden")

125.   Defendant Rick Schaden is an adult citizen of Colorado who resides at 10563 E. Goosehaven Drive, Lafayette, Colorado 80026.

126.   Rick Schaden is the son of Defendant Dick Schaden (together, the "**Schadens**"). The Schadens acquired Quiznos in 1991.

127.   Rick Schaden was the founder, Chairman and majority shareholder of Quiznos from 1991 through 2006.

128.   Rick Schaden served as the Chief Executive Officer of Defendants QFA, TQSC II, AFD, Source One, CLG, QAFT, QCE Finance, QCE LLC, QIP, QC Holding, TQM, and from February 2009 until October 2010.

129.   Rick Schaden served as the Chairman of the Board of Managers of QCE Holding LLC from May 2006 until non-party Avenue Capital acquired Quiznos.

130.   Rick Schaden served as a member of the Board of Managers of QFII from February 2005 to April 2008.

131.    Rick Schaden was the Chief Executive Officer of QFII, QFA, and TQSC II from February 2005 to January 2007.

132.    Rick Schaden served at various times from 1991 to January 2007 as the President, Chief Executive Officer, and/or Chairman of the Board of TQC, QF, and TQM.

133.    Rick Schaden has served as the Chief Executive Officer of Defendants Cervantes Capital LLC and The Cervantes Holding Company since May 2006 and, upon information and belief, maintains ownership interests in and employment relationships with each of the Cervantes Defendants.

134.    Rick Schaden also maintains control over non-parties DG Trust, RES Glacier Trust, Restaurant Retail Management LLC, and The Sandwich Trust, which, upon information and belief, have served as repositories for the monies illegally obtained through the conduct outlined in this Complaint.

135.    Dick Schaden is a resident of Colorado and is amendable to personal jurisdiction in Colorado.

### xxv.    Richard F. Schaden ("Dick Schaden")

136.    Defendant Dick Schaden is an adult citizen of Colorado who resides at 800 South 68th Street, Boulder, Colorado 80303-4336.

137.    Dick Schaden served as a member of the Board of Managers of QFA and its predecessors, TQFC, QF, and QFII from 1991 until non-party Avenue Capital acquired Quiznos.

138.    Dick Schaden served as a member of the Board of Managers of QCE Holding from May 2006 until non-party Avenue Capital acquired Quiznos.

139.    Dick Schaden served as a Director of TQSC from February 2005 to December 2005.

140.    Dick Schaden served on the Board of Directors of TQM from July 2002 to December 2005.

141.    Upon information and belief, Dick Schaden maintains ownership interests in and employment relationships with each of the Cervantes Defendants.

142.    Upon information and belief, Dick Schaden also maintains control over non-parties DG Trust, RFS Northern Tier Trust, RFS Investments LLC and The Sandwich

Trust, which have served as repositories for the monies obtained illegally through the conduct outlined in this Complaint.

143. Dick Schaden is a resident of Colorado and is amendable to personal jurisdiction in Colorado.

### xxvi.   Patrick E. Meyers ("Meyers")

144. Defendant Meyers is an adult citizen of Colorado who resides at 2576 South Milwaukee Street, Denver, Colorado 80210-6215.

145. Meyers served as General Counsel, Executive Vice President and Secretary of Defendants QFA, QCE Holding, TQSC II, AFD, Source One, CLG, QAFT, QCE Finance, QCE LLC, QIP, and TQM from July 2009 until non-party Avenue Capital acquired Quiznos.

146. Meyers served as a member of the Board of Managers of QCE Holding from May 2006 until non-party Avenue Capital acquired Quiznos.

147. Meyers served as a member of QFII's Board of Managers from February 2005 to April 2008.

148. Meyers served as the Chief Legal Officer for QFA, QFII, and TQFC from October 2006 to May 2007.

149. Meyers served as the Executive Vice President of Finance, Planning and Support of QFA, QFII, and TQFC from February 2005 to October 2006.

150. Meyers served as the Executive Vice President of Finance, Planning and Support of QF and TQFC from July 2002 to May 2007.

151. Meyers served as the Secretary, Vice President, and Executive Vice President of AFD, QF and TQFC from July 2002 to October 2006, of TQFC from July 2002 to May 2007, of QFII from February 2005 to May 2007, of QF from June 2002 to May 2007, and of TQFC from October 2000 to December 2006.

152. Meyers has served as the Chief Legal Officer and as a member of the Board of Directors for the Cervantes Holding Company since May 2006.

153. Upon information and belief, Meyers owns stock and/or membership units in one or more of the Cervantes Defendants.

154.    Upon information and belief, Meyers is an officer authorized to conduct business on behalf of the Cervantes Defendants and is the sole director of Defendant Cervantes Holding.

155.    Meyers is a resident of Colorado and is amendable to personal jurisdiction in Colorado.

### xxvii.  Steven B. Shaffer ("Shaffer")

156.    Defendant Shaffer is an adult citizen of Colorado who resides at 1840 East Cedar Avenue, Denver, Colorado 80209.

157.    Shaffer started with Quiznos in 1992 as a franchisee and became an Area Director in the St. Louis market in 1996.

158.    From October 1998 until October 2000, Shaffer worked for TQFC in a number of positions.  Shaffer became the Vice President of Franchise Support Services in October 2000.

159.    From July 2002 to February 2004, Shaffer was the Executive Vice President of Brand Expansion for TQFC and QF.

160.    Shaffer was the President of TQFC, QF and QFII from February 2004 until November 2006.

### xxviii. System Services of America, Inc. f/k/a/ McCabe's Quality Foods, Inc. ("System Services")

161.    Defendant System Services is a Delaware corporation with its principal place of business at 16100 N. 71st Street, Suite 500, P.O. Box 25109, Scottsdale, Arizona 85255.

162.    From about June 2008 to the present, System Services has been the primary distributor of Mandated Essential Goods to Quiznos franchisees in Southern California, including Plaintiffs.

163.    System Services obtains the Mandated Essential Goods from wholesale suppliers such as Kraft Foods Inc., Pepsico Inc., and Tyson Foods Inc. ("**Suppliers**") after AFD has negotiated the prices of the Mandated Essential Goods with the Suppliers.

164.    System Services knows that AFD has added mark-ups to the price negotiated with the Suppliers.

DMWEST #9515037 v1

165.    In addition to the AFD mark-ups, System Services adds its own mark-up to the Mandated Essential Goods before reselling them to the franchisees.

166.    On invoices that System Services provides to the franchisees, including Plaintiffs, System Services lists only the price that it charges the franchisees, and intentionally conceals the fact that it obtained the Mandated Essential Goods from AFD, as well as the fact that AFD has added mark-ups to the price of the Mandated Essential Goods.

167.    The firm impression left in the mind of the franchisee, including Plaintiffs, is that they are receiving the Mandated Essential Goods directly from System Services at prices that are better than those charged to similarly situated purchasers of the same goods purchased at the same time.

168.    Upon information and belief, System Services knows that the prices it charges the Quiznos franchisees for the Mandated Essential Goods, including Plaintiffs, are worse than the prices that System Services charges similarly situated purchasers for the same goods purchased at the same time.

169.    Upon information and belief, System Services and Quiznos conspired together to intentionally conceal the AFD mark-ups from the franchisees.

170.    System Services is an integral part of the fraudulent scheme alleged in this Complaint.  If System Services did not conceal the AFD mark-ups from the franchisees, Quiznos would be unable to perpetuate the scheme alleged in this Complaint against the franchisees, including Plaintiffs.

171.    System Services was named "Quiznos' Distributor of the Year" in the years 2007, 2008, and 2010.

172.    Upon information and belief, Quiznos agreed to indemnify System Services for any liability arising out of System Services' agreement to conceal the AFD mark-ups from the franchisees.

173.    Upon information and belief, System Services maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

174.    Jurisdiction over System Services is also proper pursuant to Colorado's Long-Arm Statute, C.R.S. § 13-1-124.

DMWEST #9515037 v1

### xxix.   Services Group of America, Inc. ("Services Group")

175.    Defendant Services Group is a Delaware Corporation with its principal place of business at 16100 N. 71st Street, Suite 500, P.O. Box 25109, Scottsdale, Arizona 85255.

176.    Services Group is the parent of Defendant System Services and, upon information and belief, was involved in, approved, directed, and has profited from System Services' agreement with Quiznos to conceal from the franchisees, including Plaintiffs, the mark-ups that AFD has added to the Mandated Essential Goods.

177.    Upon information and belief, Services Group maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

178.    Jurisdiction over Services Group is also proper pursuant to Colorado's Long-Arm Statute, C.R.S. § 13-1-124.

### xxx.   McLane Company, Inc. ("McLane")

179.    McLane is a Texas Corporation with its principal place of business at 4747 McLane Parkway, Temple, Texas 76504.

180.    From about September 2003 to about June 2008, McLane was the distributor of all Mandated Essential Goods to Quiznos franchisees in Southern California, including Plaintiffs.

181.    McLane operated its distribution system in the same or similar way as Defendant System Services.

182.    Like System Services, McLane obtained the Mandated Essential Goods from Suppliers after AFD had negotiated the prices with the Suppliers, knew that AFD had added mark-ups to price of the Mandated Essential Goods, and then added its own mark-ups in addition to the AFD mark-ups before reselling the Mandated Essential Goods to the franchisees.

183.    On the invoices that McLane provided to the franchisees, including Plaintiffs, McLane intentionally concealed the fact that it obtained the Mandated Essential Goods from AFD, as well as the fact that AFD has added mark-ups to the Mandated Essential Goods.

184.    Upon information and belief, McLane knew that the prices it charged the franchisees for the Mandated Essential Goods were worse than the prices that McLane charged similarly situated purchasers buying the same goods at the same time.

185.     Upon information and belief, Quiznos and McLane conspired to conceal the AFD mark-ups from the franchisees, including Plaintiffs.  McLane was also an integral part of the scheme alleged in this Complaint during the times that it served as the distributor of Mandated Essential Goods to the franchisees.

186.     Upon information and belief, Quiznos agreed to indemnify McLane for any liability arising out of McLane's agreement to conceal the AFD mark-ups from the franchisees.

187.     McLane maintains continuous and systematic business contacts with Colorado and is amenable to personal jurisdiction in Colorado.

188.     Jurisdiction over McLane is also proper pursuant to Colorado's Long-Arm Statute, C.R.S. § 13-1-124.

   **xxxi.   John Does 1-50**

189.     John Does 1 through 50 are companies and individuals affiliated with Quiznos and the Distributor Defendants, although the exact nature and relationship between these affiliated companies and individuals is unknown to Plaintiffs at this time.

## GENERAL ALLEGATIONS

**A.     <u>Quiznos Fraudulently Induces Plaintiffs to become Franchisees.</u>**

190.     Plaintiffs are former Quiznos franchisees that operated a Quiznos restaurant in Orange County, California from May 3, 2004 to January 18, 2009.

191.     Pourali first learned about Quiznos in or about October 2002 after visiting a Quiznos restaurant in Westminster, California.  Upon entering the store, Pourali saw a flyer promoting franchise opportunities to the general public.  Pourali took the flyer, which directed him to Quiznos' website, printed an application from the website, and then mailed the application to Quiznos in or about December 2002.

192.     In response, Quiznos sent Pourali a UFOC dated January 27, 2003, which Pourali read and relied upon in continuing to pursue a business relationship with Quiznos.

193.     Quiznos represented in Item 8 of the UFOC that Quiznos or its affiliates would "negotiate purchase arrangements with suppliers for the benefit of franchisees, which often include volume discounts."

194.    Quiznos knew this representation was false and made the representation with the intent to fraudulently induce Pourali to become a franchisee.

195.    If Pourali had known that this representation was false and that AFD would charge significant mark-ups on the Mandated Essential Goods that Plaintiffs would be required to purchase to Quiznos, Pourali never would have signed the franchise agreement for Store 5094 or become a Quiznos franchisee.

196.    On or about January 10, 2004, Pourali formed Plaintiff P&A Subs.

197.    On or about May 3, 2004, Pourali transferred his interest in the Franchise Agreement for Store 5094 to P&A Subs in order to protect himself from personal liability arising from any problems with the store.  Pourali purportedly remained liable to Quiznos, however, pursuant to the personal guaranty he signed.

198.    Plaintiffs opened Store 5094 on May 3, 2004.

199.    After suffering significant monetary losses for nearly five years, Plaintiffs sold Store 5094 on or about January 18, 2009.

200.    Plaintiffs opted out of the National Class Action Settlement Agreement between Quiznos and certain franchisees prior to the January 29, 2010, opt-out deadline.

201.    In late 2012, Plaintiffs learned of the fraudulent scheme alleged in this Complaint, and now bring this lawsuit to recover for the serious economic injuries inflicted upon them.

**B.    Building a Sham.**

202.    Quiznos started in 1981 with a single restaurant in Denver, Colorado.

203.    In 1991, the Schadens acquired the Quiznos brand.  At that time, there were eighteen Quiznos stores in the Denver metropolitan area, five of which were owned by the Schadens.

204.    In 1992, the Schadens began to work with Defendant Shaffer, who initially was a franchisee in St. Louis, Missouri.

205.    By 1994, Nation's Restaurant News had named Quiznos a "Hot Concept," which put the company on the map as an emerging brand.

206.    Quiznos operated as a public company from 1994 to 2001.  Under the direction of the Schadens, Quiznos grew from approximately 100 restaurants in 1996, to more than 1,000 stores in 2000.

207.    Having worked as a director of TQFC since 1993, Defendant Meyers formally joined the company in 1997 at the invitation of Rick Schaden.

208.    In 2000, the Schadens and Meyers desired to take the company private again, so Quiznos provided its public shareholders an "opportunity" to tender their common shares for $8.50/share.  Ninety-five percent (95%) of the outside shareholders challenged the price and a group of Quiznos investors participated in dissenters' rights litigation in Colorado, seeking a judicial determination of the "fair value" of the Quiznos stock.

209.    Presiding over the dissenters' rights litigation, Denver District Court Judge Robert L. McGahey, Jr. concluded that Quiznos had "acted in bad faith in its insistence that $8.50 a share was a 'fair value'" and set the price at $32.50 a share.  Judge McGahey also found that the Schadens intentionally hid "the 'true status' of Quiznos as a company on the verge of a growth explosion" by telling "other shareholders little, if anything, of substance concerning that potential growth explosion." Judge McGahey further concluded that Quiznos' proxy statement to its shareholders was "an exercise in obfuscation."

210.    Despite Judge McGahey's admonishments, Quiznos has persisted in directing similar obfuscatory practices at its franchisees, including Plaintiffs.

C.    **Quiznos' Five-Part Fraudulent Scheme.**

211.    At or near the time of the dissenters' rights litigation, the Schaden Ownership Group developed and began to implement through Quiznos and the Distributor Defendants the five-part fraudulent scheme previously outlined in paragraphs 3 to 7 *supra*.

212.    Quiznos' active concealment of the fraudulent scheme made it impossible for Plaintiffs to discover any basis for filing this Complaint until late 2012.

213.    It is now clear, however, that Quiznos, the Schaden Ownership Group, and the Distributor Defendants intentionally defrauded its franchisees, including Plaintiffs, out of hundreds-of-millions-of dollars through the following five-part scheme.

### 1.  The Hidden Mark-Ups On All Mandated Essential Goods.

214.    In or about 2000, Quiznos and the Schaden Ownership Group developed the keystone of their fraudulent scheme – creating AFD and other pass through companies that added hidden mark-ups to the Mandated Essential Goods sold to the franchisees, or what Judge McGahey called the "cash generating engine of AFD."  Quiznos and the Schaden Ownership Group furthered this scheme by conspiring with the distributors of the Mandated Essential Goods to intentionally conceal the AFD mark-ups from the invoices that the franchisees received for each purchase.

215.    In or about 2000, AFD was created as a wholly-owned subsidiary of Quiznos.

216.    Upon information and belief, the Schaden Ownership Group approved and directed the creation of AFD.

217.    The Franchise Agreements require that the franchisees, including Plaintiffs, "purchase all equipment, products, services, supplies and materials required for the operation of the Restaurant from manufacturers, suppliers or distributors designated by Franchisor or its affiliates."

218.    At various times, Quiznos designated Defendants System Services, Services Group and Mclane (the "**Distributor Defendants**") to serve as the distributors that sold the Mandated Essential Goods to the Plaintiffs.

219.    AFD uses the bulk purchasing power of the franchisees to negotiate the purchase of Mandated Essential Goods from unaffiliated wholesale suppliers such as Kraft Foods Inc., Pepsico Inc., and Tyson Foods Inc. ("**Suppliers**") at volume-discounted pricing.

220.    AFD then resells the Mandated Essential Goods to the unaffiliated Distributor Defendants at a significant mark-up from the volume discounted prices.

221.    AFD does not actually handle the Mandated Essential Goods; AFD acts solely as a "middleman" in the supply chain between the Suppliers and the Distributor Defendants.

222.    When Plaintiffs receive the Mandated Essential Goods from the Distributor Defendants, Plaintiffs are provided with an invoice for the goods purchased.

223.    The invoices list the price that the Distributor Defendant charges for the Mandated Essential Goods.  The invoices do not disclose the AFD mark-ups, or the fact that AFD negotiated the purchase of the Mandated Essential Goods from Suppliers and then resold the goods to the Distributor Defendants after adding mark-ups to the prices of the goods.

224.    Upon information and belief, Quiznos and the Distributor Defendants conspired to omit the AFD mark-ups from the invoices and to otherwise conceal the AFD mark-ups from franchisees, including Plaintiffs.

225.    Further, Quiznos agreed to indemnify the Distributor Defendants in the event of liability for failure to disclose the mark-ups to the franchisees.

226.    Upon information and belief, Meyers negotiated these agreements with the Distributor Defendants, and the Schaden Ownership Group knew about and approved these agreements.

227.    Because AFD was not identified on the invoices, Plaintiffs reasonably believed that the Distributor Defendants were Quiznos' affiliates that had "negotiate[d] purchase arrangements with suppliers for the benefit of franchisees, which often include volume discounts" as promised in Item 8 of Quiznos' UFOCs.  Plaintiffs also reasonably believed that the prices listed on the invoices reflected those volume discounts.

228.    Because the AFD mark-ups were intentionally omitted from the invoices, Plaintiffs did not know and could not have discovered that they were paying mark-ups on the Mandated Essential Goods.  Indeed, the firm impression in the mind of the Plaintiffs was that they were receiving the Mandated Essential Goods from the Distributor Defendants at prices better than those charged to similarly situated purchasers of the same goods at the same time when, in fact, the prices charged to Plaintiffs were worse than the prices charged to such similarly situated purchasers as a result of the AFD mark-ups.

229.    The  Distributor Defendants were an integral part of the fraudulent scheme alleged in this Complaint.  In essence, the Distributor Defendants acted as a fence and front man that kept AFD and its scheme hidden from the franchisees and third parties generally.

230.    Later, in addition to AFD, Quiznos created Defendants Source One, Ba-Bing, Kinetic Sourcing, Continental, CLG, S&S Equipment, and other related entities (the "**AFD-Related Entities**"), each of which added additional hidden mark-ups on products sold to the franchisees, including Plaintiffs.

231.    The business operations of the AFD Related Entities were substantially the same as AFD, including adding hidden mark-ups on all items sold to the franchisees, including Plaintiffs.

232.    Quiznos' requirement that its franchisees purchase all Mandated Essential Goods from Quiznos "or its affiliates" creates an artificial market and captive consumers which

28

eliminates competition for the sale of Mandated Essential Goods and allows Quiznos to engage in unrestricted price-gouging.

233.    Since the creation of AFD, Quiznos has seen its EBITDA (e.g., earnings before interest, taxes, depreciation, and amortization) grow from approximately $6 million in 2000 to more than $100 million in 2007.

234.    In 2006, AFD's gross margin on food and restaurant product distribution was nearly double that of every major Supplier, including the much larger SYSCO, U.S. Foodservice, Dominos Distribution, and those reporting to the RMS Survey database (showing data for 76 distributors with over $400 million in sales).

235.    Such profit margins are possible only because of the captive market of franchisees that Quiznos' created through its adhesive Franchise Agreements.

236.    In 2006, AFD received revenue of nearly $500 million from the sale of Mandated Essential Goods to its franchisees, independent of the nearly $27 million in revenue it obtained as rebates from suppliers.

237.    Upon information and belief, in 2006, S&S Equipment's share of Source One's revenues was approximately $66 million, not including nearly $5 million in additional vendor rebates.

238.    These amounts are staggering considering that Quiznos did not make a dime from the sale of Mandated Essential Goods before 2001.

239.    Since AFD's creation, Quiznos, the Schaden Ownership Group, and the Distributor Defendants have known that AFD was adding mark-ups to the Mandated Essential Goods and that the mark-ups were not disclosed to the franchisees.

240.    Since AFD's creation, Quiznos, the Schaden Ownership Group, and the Distributor Defendants actively have concealed the AFD mark-ups from the franchisees so as to keep them from discovering they were being defrauded out of hundreds-of-millions-of dollars each year and filing a lawsuit similar to the present action to recover their losses.

241.    AFD's hidden mark-ups are not only fraudulent, but also breach Plaintiffs' Franchise Agreements, as Quiznos maintained complete discretion over the price at which the Mandated Essential Goods were sold to Plaintiffs, and did not exercise that discretion in good faith as required by Colorado law.

2.      **Selling The Fraud.**

242.    With the hidden "cash generating engine of AFD" firmly in place, Quiznos set out to drastically increase the number of franchisees by aggressively marketing the "American Dream" of business ownership to relatively unsophisticated consumers using high-pressure sales techniques, fraudulent misrepresentations, material omissions, and outright lies.

243.    To accomplish its rapid expansion, the Schadens brought in Defendant Shaffer, a proven "closer" who had perfected the use of scripted, slick and deceptive sales presentations in order to build Quiznos' St. Louis market into one of the largest in the United States.

244.    The most egregious lies were those that induced consumers to purchase franchises in reliance on Quiznos' promises in Item 8 of its UFOCs and elsewhere that Quiznos and its affiliates would "negotiate purchase arrangements with suppliers for the benefit of franchisees, which often include volume discounts."

245.    In their capacity as Board Members, Defendants Rick Schaden, Dick Schaden, Meyers, and Shaffer approved the UFOCs, including the misrepresentations in Item 8.

246.    In his capacity as general counsel, Meyers reviewed and approved the UFOCs.

247.    Defendant Shaffer helped to create and was familiar with the UFOCs.

248.    Quiznos aggressively sold franchises by claiming that it had "proven" business models even though Quiznos' own internal data showed that the vast majority of franchisees were unprofitable as a result of the hidden mark-ups, and Quiznos further knew that such unfettered expansion would encroach upon existing stores, harming the franchisees' bottom line.

249.    Plaintiffs, like other franchisees, relied on these misrepresentations to their detriment.  Had Plaintiffs known that instead of receiving volume discounts, Quiznos was adding significant mark-ups to the Mandated Essential Goods the franchisees were required to purchase each week, they never would have signed a single franchise agreement.

250.    There can be no doubt Quiznos' fraudulent marketing efforts worked:  the Quiznos System grew from approximately 1,000 franchisees in 2000 to more than 5,000 franchisees in 2006.

**a.**    **Aggressive and Widespread Marketing.**

251.    Under the direction of Defendant Shaffer, Quiznos employed deceptive marketing that blatantly misrepresented the state of the brand and used illegal and fraudulent tactics to entice prospective franchisees to purchase a franchise.  Through in-store displays, direct mail brochures, the Internet, radio commercials, television infomercials, and advertising flyers, Quiznos aggressively enticed prospective franchisees to join the system with various factual distortions, misrepresentations, and nondisclosure of material facts.

252.    Every person who walked into a Quiznos store was targeted as a potential franchisee.  Quiznos required each of its franchisees to maintain prominent in-store displays which contained flyers proclaiming that Quiznos was "Ranked #1 Sandwich Chain" and "The Door to Opportunity is Shaped Like a Sub."  In a section titled "Franchise Support:  What it Means to Have the Quiznos Sub Brand Behind You," Quiznos blatantly misrepresented that "[w]e'll even help you place your order from one central distributor at negotiated volume pricing." (emphasis added).

253.    If the franchisees did not display these in-store flyers, they would lose points on their inspections, which would result in a loss of rebates and eventually default notices.

254.    Similarly, Quiznos required its franchisees to play "Muzak" CDs in their stores, which contained embedded advertisements that interrupted the music every half hour and told all customers in the store to contact Quiznos about buying a franchise.

255.    The Muzak CDs and the in-store flyers, in turn, directed consumers to the company's website, which falsely claimed that Quiznos had "proven systems" and a "proven economic model."  The website also made misleading earnings claims to would-be franchisees by suggesting that the typical Quiznos restaurant "draws 200 plus [customers] on a daily basis with customers who are fanatically loyal (as validated in focus groups and consumer surveys)."  In one website posting, Quiznos represented that it "focuses on distinctive sites without over-saturating markets" when, in fact, the company had decided in April 2002 to pursue encroachment in order to increase the number of franchisees so as to supercharge AFD's "cash generating engine."

256.    Representing to prospective franchisees that "[n]ot all entrepreneurs get toasted, just the smart ones," Quiznos painted the picture of a meaningful alternative to simply "finding another job", stating that "Quiznos has grown in 26 years to be a leading franchise business opportunity," and making promises of "site selection assistance . . . local support . . . third party financing . . . national television advertising . . . and thousands of locations worldwide."

31

257.     On radio commercials, Quiznos asked:

> Ever **dream** of owning your own business?  **Earning money for yourself instead** of **someone else?**  Well, make your dream a reality by attending a free Quiznos Business Ownership Seminar. Entrepreneur Magazine rates Quiznos Sub as one of the top franchising opportunities in America . . . . **No prior restaurant experience is necessary.  Seats are limited.**  So call now 1-800-925-QUIZ or go to QuiznosRadio.com.

258.     To get prospective franchisees to the next step in the sale process, sales personnel gave them a push.  At Defendant Shaffer's direction, the company paid an administrative staff in Denver to develop and solicit leads and paid hefty commissions to everyone involved in the sales process to get what Shaffer referred to as "butts in the chair" at sales events being held around the country.  Quiznos also paid the administrative staff to qualify applicants and gave commissions to those who got applicants to attend the sales seminar, creating an inherent conflict of interest as the individual completing the application was given financial incentives to have the application approved regardless of whether it warranted approval.  By 2004, top management referred to Quiznos' astronomical success in selling franchises by reference to Major League Baseball Hall-of-Famer Dizzy Dean: "It Ain't Braggin If You Can Do It."

259.     At sales seminars held in hotel conference rooms throughout the United States, Quiznos would go in for the kill and build on the well-fertilized and misleading promises of business ownership, turnkey and proven systems, and operational support. With regimented clarity, Quiznos' representatives, many of whom had little or no experience with owning or operating a restaurant, would explain to the prospective franchisees "Quiznos is the ultimate business model."  Shaffer explained it this way under oath:

> [O]ur sales process was a highly structured, regulated process .. . [W]e structured and sculptured every step along the way.  And our people were acquired [sic] to basically stay on track.

260.     Using this "highly structured" process, Quiznos promised the allure of being an entrepreneur with the safety of Quiznos' "turnkey business model" and affirmatively misrepresented that it had a "proven concept" nationally.

DMWEST #9515037 v1

261.    Quiznos further committed to providing "support systems every step of the way in building a Quizno's restaurant" and promised having "a local representative . . . trained to provide assistance to each franchise owner from training to site selection to the new store opening."  The scripted sales pitch would draw in prospective franchisees by promising "on-going operations support" that would include "quality assurance, operations, marketing and business management as well as special support for new promotions and new product roll-outs."  All of these representations were strategically placed around other representations demonstrating the growing number of franchise units that had been sold in the United States, how a failure to act would lead to a missed opportunity, and how national publications like Entrepreneur Magazine and Nation's Restaurant News had touted Quiznos with "top rankings."

### b.    Quiznos' Exploitation of Its Informational Advantage to Ensnare Plaintiffs.

262.    As the franchisor, Quiznos maintains a significant informational advantage over its franchisees, which it has used to its advantage in order to perpetuate its fraudulent scheme against its franchisees, including Plaintiffs.

263.    At all times, Quiznos has had access to material information regarding its franchise system which was far superior and more complete than the information it chose to make available to Plaintiffs or that was available to them through any other sources.  Rather than disclose this information to franchisees, Quiznos has utilized this information gap to further its own interests at the franchisees' expense.

264.    Quiznos made it a policy to selectively disclose information without telling the complete story in a deliberate effort to mislead the franchisees, which is every bit as fraudulent as an outright lie.

265.    For example, Quiznos provides representative financial data to prospective franchisees through various "earnings claims" found in their UFOCs and/or FDDs, which provides:

> YOUR ACTUAL FINANCIAL RESULTS ARE LIKELY TO DIFFER FROM THE FIGURES PRESENTED.  THE AVERAGE GROSS SALES FIGURES PRESENTED ABOVE REPRESENT SALES BEFORE DEDUCTIONS FOR CONTINUING ADVERTISING AND ROYALTY FEES PAYABLE TO THE FRANCHISOR AND ALL OTHER OPERATING EXPENSES. SEE ITEMS 6 AND 7 OF THIS OFFERING CIRCULAR FOR A PARTIAL LIST OF EXPENSES YOU WILL INCUR.

33

> THE SALES FIGURES ABOVE ARE AVERAGES OF HISTORICAL DATA OF SPECIFIC FRANCHISES. THEY SHOULD NOT BE CONSIDERED AS POTENTIAL SALES THAT MAY BE REALIZED BY YOU. WE DO NOT REPRESENT THAT YOU CAN EXPECT TO ACHIEVE THESE SALES LEVELS. ACTUAL RESULTS VARY FROM RESTAURANT TO RESTAURANT, AND WE CANNOT ESTIMATE THE RESULTS OF ANY PARTICULAR FRANCHISE.

This "warning" is itself misleading, because Quiznos knows that the "gross sales" numbers are based on what Quiznos refers to as "Net 2" data — a higher number that does not include discounts, including the cost of unreimbursed coupons.

266.    Similarly, Quiznos own financial model developed for franchisee site evaluation is misleading because it projects earnings and returns exclusive of Quiznos' royalties and uses food, paper, and labor ("**FPL**") percentages that are unachievable by franchisees with Quiznos' inflated costs.

267.    Upon information and belief, Quiznos also deceptively uses its "Net 2" sales (sales before discounts) versus "Net 3" sales (sales after discounts and actual money going into the bank) to derive and benchmark its costs against competitors who use a Net 3 sales figure, giving a false picture of Quiznos' food costs versus competitors.

268.    In another example, Quiznos knows that its Average Unit Volumes ("**AUVs**") have been flat or falling since 2004, yet continues to promote the execution of leases that effectively doom the franchisees to economic collapse, particularly when combined with the economic impact of Defendants' other deceptive practices. The long-term leases (10 to 15 years) often ultimately result in the economic demise of a franchisee, because they cannot make a profit under such onerous rent obligations. And, when the franchisee prudently decides to close its doors to put an end to its losses, it is left with a landlord suing it for breach of its lease obligations. This a bitter irony for a franchisee given that Quiznos claims that it will assist franchisees to develop the appropriate real estate relationship and to ensure the long-term financial viability of the store.

269.    Quiznos owed at all relevant times a legal duty to disclose complete information to Plaintiffs to avoid making affirmative representations about the franchise system (including, without limitation, the earnings claims) that were misleading. Quiznos breached this duty by, among other things, omitting the following material facts in advance of Plaintiffs' decisions to purchase their franchises:

34

(a)     That Quiznos knew, at the time of the dissenters' rights lawsuit, that "40% of Quiznos units were not breaking even" — a fact that Defendant Rick Schaden admits he "would like to know" before buying a Quiznos franchise.

(b)     That AFD, Source One, Ba-Bing, CLG, Continental, Kinetic Sourcing, and others would be used as profit centers by those in control of the brand and that the promise to negotiate supplier prices "for the benefit of franchisee" was illusory, misleading and deceptive.

(c)     That AFD was adding mark-ups, which were substantial and far beyond industry standards, to the price of the goods that the franchisees would be required to purchase to operate their stores.

(d)     That Quiznos was, in fact, a business primarily focused on making money as a distributor of Mandated Essential Goods, not as a franchisor offering "franchises to operate a restaurant offering submarine sandwiches, salads, soups, and soft drinks under the service mark 'QUIZNOS'."

(e)     That Quiznos did not reimburse franchisees for retail customer coupons, effectively adding 6% or more to the franchisee's carrying costs such that the gross sales numbers represented in the UFOC were inaccurate.

(f)     That Quiznos' approach on coupons would effectively raise the percentages paid on a weekly basis for marketing and advertising by an additional six percent (6%) or more.

(g)     That the sales agents who sold Plaintiffs their franchises and those who solicited their participation in the franchise sales seminar process had economic incentives to sell them the franchise.

(h)     That "same store" sales (the economic metric by which a franchisor compares growth on an apples to apples basis) were consistently trending down from their historical levels, at least as represented by Quiznos in the dissenters' rights lawsuit.

(i)     That, in Quiznos' view at the time of the dissenters' rights suit, AUVs for the typical Quiznos franchise were not "large enough for the franchisee to easily make a profit, unless the franchisee worked in the store him or herself, often with the assistance of a spouse" and often without pay.

(j)     That Quiznos routinely raided the advertising and marketing fund for its own purposes unrelated to those contractually established in the franchise agreement, including the sale of encroaching franchises.

(k)     That Quiznos knew, at the time Plaintiffs acquired their stores, that it had a large number of financially "distressed stores" and an immediate need to train operations staff in handling large volumes of store turnovers in the system.

(l)     That the competition for securing quality QSR real estate in sites that would promote success of the Plaintiffs' stores was fierce and that Quiznos would promote opening a store over validating the viability of the site.

270.    Quiznos also purposefully misled Plaintiffs in the UFOC by resorting to half-truths, incomplete statements, and outright lies that made the UFOC misleading and fraudulent. The UFOCs presented to Plaintiffs contained the following misrepresentations and misleading statements and omissions that were material to Plaintiffs' decisions to acquire a franchise:

(a)     That Quiznos and its affiliates "negotiate purchase agreements with suppliers for the benefit of Franchisee."

(b)     That Quiznos turnover rates are on par with national averages even though the UFOC under-reports the brand's closure rates and fails to report its true turnover rate, which in 2006 was an astounding thirty percent (30%) (more than three times the national average) and by 2009 remained close to twenty-four percent (24%).

(c)     That Quiznos manipulates its use of the phrase "gross sales" in the UFOC to overstate AUVs for the "typical" Quiznos franchise and also fails to disclose that, while AUVs in the sandwich sector have slowly increased over the years, Quiznos' AUVs have consistently declined – from $414,000 in 2005 to $300,000 in 2009.  In the Quiznos system, the company distinguishes between what it calls "Net 2" and "Net 3" revenues. Nevertheless, Quiznos does not tell franchisees about this distinction until after they have signed a franchise agreement, most often at their franchise training close to the time they are set to open their restaurant. The distinction is critical, because "Net 2" data, which is what Quiznos disclosed in the UFOC prior to the Plaintiffs' signing of the franchise agreements, reflects none of the discounts borne by the franchisee, most notably the coupon discounts that until very recently ran as high as six

36

percent (6%) or more each week. For this reason, the "Earnings Claims" in each UFOC constitute deceptive statements about store earnings and are misleading.

(d)     That Quiznos engages in routine realignment of the corporate entities serving as the franchisor so as to avoid reporting historical financial data for operations of the franchise system on the basis that the "newly created" entity has no such history.

(e)     Upon information and belief, that the typical Quiznos franchisee will have only a thirty percent (30%) variable margin in which to pay fixed costs of franchise operations; whereas most Quick Service Restaurants ("**QSRs**") maintain forty percent (40%) to fifty percent (50%) variable margin for such fixed costs.

(f)     That the rebates from Quiznos' vendors (disclosed in the UFOC) would result in excessive and unreasonable costs being imposed on the franchisee for the purchase of Mandated Essential Goods.

(g)     That Source One, AFD and the other Quiznos affiliates responsible for provisioning stores consider it critical to their success as "wholesalers" that they obtain the right to buy low in the open market and sell high to the franchisee.

(h)     That the rent ranges set out in the UFOC will not have an adverse impact on store profitability.

(i)     That labor costs are understated due to the mandatory personnel requirements, which necessarily require the owner-operator to work full-time for free or generate operating losses.

(j)     That food, labor and paper costs, often the largest cost items in any restaurant operation, were consistent with industry averages.  In fact, the UFOC fails to provide complete and non-misleading information related to such costs through the deceptive use of "Net 2" percentages (which are lower because they are based on gross sales not including discounts) rather than "Net 3" percentages (which are higher because they are based on gross sales including discounts).  Quiznos food and paper costs are consistently, in fact, above industry standards.

DMWEST #9515037 v1

(k)     That Quiznos would literally flood the market with coupons and effectively mandate their acceptance without reimbursement from Quiznos.

(l)     That Quiznos would not actually provide reimbursement checks for stores that agreed to abide by all of Quiznos' restrictive terms or upon the launch of programs such as "Go Forward Rebates and Greenline Audits" requiring the franchisee to make all purchases through Quiznos distributors in exchange for quarterly rebates and then would have those rebates canceled in 2010 without explanation.

(m)     That Quiznos would automatically ship unneeded items at inflated prices to franchisees and then automatically deduct costs from franchisees' accounts, in effect using franchisees as an ATM whenever Quiznos needed liquid cash.  Or, for franchisees rightfully refusing such unneeded items, Quiznos would then charge restocking fees and automatically reship the items and deduct the payment denying any recourse or remedy for the franchisee.

271.    Quiznos continues its deceptive relationship after obtaining the franchisees' signature on the franchise agreement. During required corporate training for new franchisees, Quiznos represents through the use of inaccurate and deceptive graphs, charts and related calculations that, within five years, a Quiznos location would be debt free and maintain a substantial resale value. Based upon these deceptive figures, Quiznos encourages and induces existing franchisees to purchase multiple locations, before they can become aware of the true lack of profitability resulting from Quiznos' unlawful policies and practices.

272.    Quiznos carries this practice through with those who actually open their stores by the weekly delivery of false food, labor, paper and discount data for operators in the field. In so doing, Quiznos distributes summary data that understates the percentage of each by basing these percentages on the listed "Net 2" revenue numbers. This approach is misleading and inconsistent with industry practice, which typically reports such costs based on the net sale number (what Quiznos calls "Net 3") so as to accurately show the true cost of running the business.

### c.   Quiznos' Unconscionable and Unenforceable Franchise Agreements.

273.   Quiznos further exploits its informational advantage and unequal bargaining power to require prospective franchisees to sign unconscionable and one-sided franchise agreements, without any potential for negotiation of their terms.  When drafting these adhesive franchise agreements, Quiznos purposely included several unconscionable provisions that it intended to later use as a shield to protect it from litigation of this kind.

274.   For example, Quiznos requires all prospective franchisees to sign a "Disclosure Acknowledgement Statement" stating that they are not relying on any information outside the UFOC or FDD in deciding to purchase a franchise.

275.   Quiznos' sales representatives induce franchisees to sign the Disclosure Acknowledgement Statement or other related waivers by telling the prospective franchisee that it is "standard," "required," a "formality," and "routine" to state that they only relied on the UFOC even though the sales representatives knew that the franchisees relied on information not found in the UFOC, including, without limitation, information provided at sales seminars, statements by Quiznos-authorized sales representatives, information on the Quiznos Website and in other advertising materials, and in information from other public media, such as Entrepreneur Magazine.

276.   Upon information and belief, Quiznos even had an official policy of requiring prospective franchisees to write "None" under a section asking what outside information they had relied upon, even though the franchisees were plainly relying on information from the sale representatives, in an unconscionable effort to relieve itself of legal liability for the oral misrepresentations that Quiznos trained its sales personnel to make.

277.   In a similar example, upon information and belief, Quiznos has a policy of including releases in nearly every legal agreement the franchisees are required to sign with Quiznos, including something as minor as transferring ownership from the franchisee in his or her personal capacity to a corporate entity wholly owned by the franchisee.  Later, Quiznos unconscionably argues that such releases wholly prevent the franchisees from bringing any legal action against Quiznos.

278.   To take full advantage of this strategy, Quiznos has historically preyed on unsophisticated franchisees who are members of the consuming public.

279.   The practice of having the Plaintiffs sign non-reliance clauses is intended to lead franchisees to believe that litigation is futile and to rig the result in later litigation.

280.   Upon information and belief, Quiznos' instructed its agents selling franchises to require the franchise to complete the legally-unenforceable non-reliance clause for the franchisee no matter the facts so as to allow Quiznos to later argue that the franchisee relied on nothing other than the misleading UFOC and one-sided franchise agreement. And, while the franchise agreement advises the franchisees to retain counsel to review it in advance of signing, Quiznos' representatives told Plaintiffs that the retention of counsel would be "unnecessary" or "a waste of money."

281.   These practices are unconscionable and/or illegal and give rise to factual questions about the tactics used by Quiznos in selling franchises throughout the country and in Colorado and the legal legitimacy of any claim by Quiznos that the Plaintiffs had any meaningful "freedom of contract" in deciding whether to sign their franchise agreements as well as whether the franchisees should be bound by any of the franchise agreements' one-sided provisions that have no commercially reasonable basis.

### d.   Deceptive Practices Specifically Used to Sell the Franchises to the Plaintiffs.

282.   In addition to the false and misleading representations in Quiznos' UFOC and alleged elsewhere in this Complaint, Quiznos representatives made the following express fraudulent statements and omissions with the intent to deceive Plaintiffs into signing its franchise agreements and operating franchises for Quiznos:

(a)   On or about May 2004, one of Quiznos' Area Directors who was working with Greg Spaulter told Pourali that he was required to purchase all food, supplies and other services from Quiznos or its affiliates but that he would receive volume discounted prices because of the purchasing power of the Quiznos system.

(b)   Greg Spaulter failed to disclose that Quiznos owned and/or controlled Source One, AFD, and various other "affiliates," all of which are Quiznos-mandated food and supply providers;

(c)   Greg Spaulter provided false and misleading information related to the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos and its approved suppliers and distributors;

(d)   While Mr. Pourali was in Denver for mandated training, a constant theme was that the prices of Mandated Essential Goods were negotiated in the "best interest" of the franchisee, and that Quiznos negotiated, to the advantage of the franchises, "best pricing" due to volume discounts;

(e)     Greg Spaulter failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the cost to franchisee of operating a Quiznos franchise;

(f)     Greg Spaulter failed to disclose that Quiznos' earnings claims were calculated based on "Net 2" data, as opposed to "Net 3" data, the latter of which represented the revenues that would actually be received by a franchisee; and

(g)     Greg Spaulter and Quiznos representatives in Denver failed to disclose that 40% of franchisees in the United States and Canada were not profitable and, instead, painted a picture that Quiznos was an "up and coming" franchise business;

(h)     Greg Spaulter and Quiznos representatives in Denver provided false and misleading statements about franchisee obligations to pay for advertising, representing that it would cost only 5% of gross revenues;

(i)     Greg Spaulter misrepresented and otherwise failed to disclose all material facts regarding Quiznos' growth and expansion plans for the Orange County market, which resulted in the Plaintiffs experiencing encroachment from competing stores that led to a loss of sales; and

(j)     Quiznos presented false and misleading information related to the costs associated with lease approval, the assistance provided by the franchisor in day-to-day operations, the responsibility of Greg Spaulter as the Area Director, how the marketing and promotion fees collected from the Plaintiffs would be used, and how Quiznos would make use of the advertising fund;

### 3.     Quiznos' Abuse of Couponing and Discount Programs.

283.    As the number of franchisees increased exponentially, Quiznos intentionally abused couponing and other discount programs in order to increase its own profits derived from AFD's hidden mark-ups on Mandated Essential Goods.

284.    Under the franchise agreements, Plaintiffs were required to honor all coupons and other discount programs, which forced Plaintiffs to give away free or deeply discounted food products, resulting in losses from each coupon or discount.

285.    Quiznos and the Schaden Ownership Group knew this, but the massive profits generated from AFD's hidden mark-ups created a perverse incentive to increase the

DMWEST #9515037 v1

sheer volume of Mandated Essential Goods that were pushed out the doors to consumers, regardless of whether Plaintiffs actually derived any profits therefrom. Indeed, the faster the Mandated Essential Goods moved out the Plaintiffs' stores, the quicker the Plaintiffs' had to replenish such Mandated Essential Goods, generating significant profits for AFD and Quiznos.

286.    In addition, by failing to reimburse Plaintiffs for the costs associated with Quiznos' excessive use of coupons, Quiznos effectively increased the cost of marketing and advertising to the franchisees by an additional six percent (6%) or more of weekly sales (i.e., the average cost of discounts for the period 2000 to 2006) in direct contravention of Quiznos' contractual promise that Plaintiffs' advertising and marketing expenses would not exceed five percent (5%).

287.    Upon information and belief, Quiznos and the Schaden Ownership Group knew that Quiznos excessive couponing and discount programs were financially detrimental to franchisees, yet knowingly misrepresented to the franchisees that such programs were justified on the basis that they increased the number of consumers visiting the stores, purportedly to the benefit of the franchisees.

### 4.    The White Paper And Other Ongoing Lies.

288.    By 2005, franchisees began to complain about the high cost of food and other supplies.  Although the franchisees had no idea AFD was adding mark-ups to the Mandated Essential Goods, they nevertheless suspected that food prices could be lower and that perhaps Quiznos was not doing a good job of negotiating prices with wholesale suppliers.

289.    Rather than address these complaints honestly, Quiznos covered-up its scheme by disseminating to the franchisees propaganda containing a multitude of false and misleading statements, all of which were designed to placate the franchisees and prevent them from discovering the fraudulent scheme alleged in this Complaint.

290.    On July 6, 2005, Quiznos disseminated the "White Paper" to all its franchisees, which was signed by Defendant Shaffer.

291.    The White Paper misrepresented that various complaints regarding high food costs, among other issues, were based on "misinformation" being distributed by individuals in the Quiznos system.  Shaffer claimed that in stark contrast to such "misinformation," Quiznos actually had developed a distribution system "which results in lower costs to the Franchise Owners."

292.     The White Paper dedicates three pages to discussing "food cost," and poses the question:  "Are Franchise Owners' food and paper costs higher because they are forced to use Quiznos-approved suppliers?," it never once mentions AFD or the fact that AFD was adding significant mark-ups to the goods sold the franchisees.

293.     The White Paper also attempted to dissuade the franchisees from comparing the prices they paid for food with competitors' prices, explaining that "[c]omparing the Subway and Quiznos system is more complex than simply looking at food prices."

294.     Defendants Rick Schaden, Dick Shaden, Meyers, and Shaffer reviewed and approved the White Paper.

295.     In August 2005, Quiznos sent a newsletter to the franchisees that mirrored the promises and commitments contained in the White Paper that Quiznos was working to achieve changes in the system to make franchisees more profitable.

296.     Similarly, in a videotaped presentation from 2006, Defendant Shaffer claimed: "Our top priority for 2006 is to help you reduce your FLPDs (e.g., "food, labor, paper and discounts").  In 2005, our chain's FLPDs were around 59% and that is just too high."

297.     Starting in or about 2006, Quiznos developed what it called the "Green Line Sharing Program," which gave the franchisees small rebates of approximately 1.65% if the franchisees were in good standing and purchased all "food, paper and chemicals through Quiznos distribution centers."

298.     Upon information and belief, in memos sent to all franchisees, including Plaintiffs, Quiznos represented that the Green Line Sharing Program "allows us to better leverage the collective purchasing power of the chain to create better pricing, which benefits the entire system."

299.     In or about 2007, Quiznos changed the name of the "Green Line" program to the "Go Forward Rebate Program."

300.     Upon information and belief, Quiznos continued to send memos and other notices to its franchisees, including the Plaintiffs, which represented that "[w]ith the Go Forward Rebate Program, we are working together with Franchise Owners to grow profitably by leveraging our restaurants' collective purchasing power."

301.     Quiznos made these representations with the intent of deceiving the franchisees into believing that they were receiving the full volume-discounts that Quiznos had promised to negotiate for the benefit of franchises in its UFOCs and elsewhere, even though Quiznos knew that the mark-ups added by AFD and the AFD-Related Entities

43

were significantly greater than any rebate given to the franchisee through the Green Line Sharing Program or the Go Forward Rebate Program.

302.    Quiznos knew the above representations, among others, were false and intentionally misleading.  Such representations were made to placate the franchisees and prevent them from discovering the fraudulent scheme and filing lawsuits similar to the present action.

      **5.**     **The Fraudulent Transfer to the Schaden Ownership Group.**

303.    Upon information and belief, in the mid-2000s, as profits from AFD's hidden mark-ups surpassed $100 million each year and knowing that franchisees had begun bringing lawsuits based on high food prices, the Schaden Ownership Group executed the final part of their scheme – a series of capital transactions, including a leveraged buyout and dividend recapitalization, that ultimately burdened Quiznos with nearly $870 million debt collateralized by the hidden mark-ups, followed by a series of self-directed member distributions of nearly all the proceeds from the debt leaving Quiznos insolvent and with no choice but to charge the AFD mark-ups in perpetuity.

304.    This plan was an interesting variation on the scheme at issue in the Dissenters' Rights Lawsuit, where Denver District Court Judge Robert L. McGahey found that although certain "loans were technically made to Quizno's as a corporation, they functionally were personal loans to Richard Schaden and his group to fund this cash out merger."

305.    In or about 2004, Quiznos and the Schaden Ownership Group knew that certain of its franchisees had filed a lawsuit in the United States District Court for the District of Colorado which alleged, among other things, that Quiznos had "not passed on savings realized through volume discounts to franchisees" (the "C.K.H. Lawsuit").

306.    Quiznos never disclosed the C.K.H. lawsuit to its franchisees, including Plaintiffs, in its UFOCs or elsewhere.

307.    Upon information and belief, in or about December 2005, the Schaden Ownership Group, through the Cervantes Defendants, engaged Goldman Sachs & Co. to shop Quiznos at an offered price of $2.3 billion.

308.    In short, Quiznos had purportedly grown from a company worth $25 million in 2000 to a company worth $2.3 billion in only five years.  Growth of this kind has never occurred in any franchise business, including established brands like McDonald's and Subway.  As is now known to Plaintiffs, growth of kind was only possible because of the fraudulent scheme alleged in this Complaint.

44

309.    Upon information and belief, in or about 2006, the Schaden Ownership Group approved a series of capital transactions including a leveraged buyout that gave J.P. Morgan a forty-nine percent (49%) ownership interest in Quiznos.

310.    Upon information and belief, the capital transactions left Quiznos with at least $870 million debt which, upon information and belief, was collateralized in whole or in large part by AFD's fraudulently-derived income stream.

311.    Upon information and belief, shortly after Quiznos received the proceeds from the debt, the Schaden Ownership Group, through a series of dividend recapitalizations, transferred to themselves nearly all of the proceeds of the $870 million debt as member distributions (the "Member Distributions").

312.    Upon information and belief, Quiznos received no consideration in exchange for the Member Distributions, but instead incurred a significant liability not only from the $870 million debt itself, but also by having to service the interest on the debt going forward.

313.    Upon information and belief, by issuing approximately $870 million debt collateralized by AFD's mark-ups and then fraudulently transferring the proceeds to themselves as member distributions, the Schaden Ownership Group knew that the AFD hidden mark-ups would continue in perpetuity as the profit derived from the hidden mark-ups was the only way Quiznos could generate enough revenue to service the interest on the $870 million debt and eventually pay off the debt.

314.    Upon information and belief, the Schaden Ownership Group made the Member Distributions with the actual intent to defraud the franchisees.  To wit:

> (a)    The Member Distributions were made shortly after Quiznos incurred approximately $870 million in debt;
>
> (b)    The Schaden Ownership Group were insiders at the time they made the Member Distributions to themselves;
>
> (c)    The Schaden Ownership Group concealed the Member Distributions from the franchisees, including Plaintiffs;
>
> (d)    The Schaden Ownership knew Quiznos had been sued and threatened with various other lawsuits from stockholders and franchisees, including the C.K.H. Lawsuit, before the Member Distributions were made;
>
> (e)    The Member Distributions included substantially all of Quiznos' assets;

(f)     The Member Distributions were made without Quiznos receiving any consideration that was reasonably equivalent to the value of the Member Distributions in return.

(g)     The Schaden Ownership Group made the Member Distributions shortly after Quiznos' incurred the $870 million debt.

(h)     Quiznos became insolvent shortly after the Member Distributions were made;

(i)     Shortly after the Member Distributions were made, the Schaden Ownership Group laundered the money through their other investments, leaving Quiznos unable to repay the $870 million debt other than to perpetually pursue the fraudulent scheme alleged in this Complaint.

315.    Prior to and including the time that the Schaden Ownership Group made the Member Distributions, Plaintiffs were creditors of Quiznos and the Schaden Ownership Group as Plaintiffs had the right (unknown to them at the time) to assert the claims alleged in this Complaint against Quiznos and the Schaden Ownership Group.

316.    In sum, from 2000 to 2005, the Schaden Ownership Group built Quiznos into a Company allegedly worth $2.3 billion through the fraudulent scheme alleged in this Complaint, sold a 49% interest in the company in a highly-leveraged buyout, fraudulently transferred the proceeds from the buyout to themselves as member distributions through dividend recapitalizations, and then left the Company nearly insolvent with no way to pay the interest on the $870 million debt other than to perpetuate the fraudulent and untenable AFD mark-ups in perpetuity or at least until the Quiznos franchise system ultimately collapsed.

317.    Upon information and belief, the Schaden Ownership Group made each of the above decisions with the actual intent to defraud the franchisees, including Plaintiffs, out of any opportunity to recover on the claims alleged in this Complaint, which the Schaden Ownership Group knew the franchisees could have asserted at the time of the fraudulent transfers had Plaintiffs known about the fraudulent scheme alleged herein.

46

## DEFENDANTS ARE ESTOPPED FROM
## ASSERTING CERTAIN DEFENSES

318.    Throughout the implementation of their fraud and continuing until the present day, Defendants have engaged in affirmative conduct and made false and misleading representations, including but not limited to those misrepresentations described herein, with the actual intent and effect of preventing Plaintiffs from becoming aware of their rights and otherwise dissuading Plaintiffs from pursuing legal action to vindicate those rights.

319.    In particular, various Quiznos representatives have consistently and routinely represented that franchisees' concerns raised in this Complaint and elsewhere were of the utmost importance to Quiznos and would be rectified, which served the deliberate purpose of lulling Plaintiffs into believing that Quiznos had their best interest at heart and that the pursuit of legal action was unnecessary. The following are examples:

(a)    In late 2003 and early 2004 John Fitchett represented that Quiznos was "working to reduce food and paper costs" when, in actuality, Quiznos had intentionally set out at that time to continue its policy of raising its prices and extracting excessive profits from the franchisees, which costs have actually increased.

(b)    When Quiznos reached the milestone of having opened 1,800 franchises in or about 2003, it falsely represented to its franchisees that it constituted a "buying club" and that those prices for food and supplies would be going down.

(c)    In an Annual Meeting in 2005 in Dallas, Texas, Quiznos representatives falsely stated that food and supply pricing would be lowered and that Pepsi would be providing revenue for incremental national advertising.

(d)    In regular meetings of the regionally-based Marketing Action Teams ("**MATs**"), Quiznos falsely implied to MAT members that Quiznos, including former Chief Executive Officer Brenneman, is concerned about changes to help franchisees become profitable and deliberately requests members of the MAT team to contact store owners and advise of Quiznos intent to resolve the problems with the franchise system.

(e)    In a videotaped presentation from 2005, Shaffer stated: "In 2005 franchise profitability is one of my top priorities. There are two ways for franchisee to make more money: (1) increase sales and (2) lower costs. We've made some strides by increasing sales and we've shown some improvement in

lowering costs but discounts remain way too high. Rest assured, we will lower discount rates." In actuality, sales increases through unfunded coupon discounts only serve to increase a franchisee's costs and the prices for Mandated Essential Goods has steadily increased while quality of the goods has often decreased, such as the use of neck cut meat in place of actual prime rib (although the franchisees are charged the same price for the inferior product) and substitution of mixed soy-oils for true olive oils.

(f)     In a July 6, 2005 "White Paper" authored by Defendant Shaffer, Quiznos told all franchisees (fraudulently as it turned out) that problems related to food costs, abuse of the advertising fund, deflated AUVs and encroachment were not the result of Quiznos' conduct but were based on "misinformation" distributed by individuals in the system, including the Toasted Subs Franchisee Association, Inc. ("**TSFA**"), an independent franchisee association and franchisees' only vehicle for communication among themselves.

(g)     In August 2005, Shaffer and his management team sent a newsletter to the franchisees that mirrored the promises and commitments in the "White Paper" that Quiznos was working to achieve changes in the system to make franchisee more profitable.

(h)     In a videotaped presentation from 2006, Shaffer claimed: "Our top priority for 2006 is to help you reduce your FLPDs (e.g., "food, labor, paper and discounts"). In 2005, our chain's FLPDs were around 59% and that is just too high."

(i)     Starting in 2006 and continuing at least until Plaintiffs sold their store in early 2009, Quiznos sent memos to Plaintiffs promising that under its "Green Line Sharing Program" and "Go Forward Rebate Program" Quiznos was "working together with Franchise Owners to grow profitably by leveraging our restaurants' collective purchasing power," even though Quiznos knew that AFD's mark-ups were significantly greater than any rebate given to the franchisee through either rebate program.

(j)     Quiznos has at various times used a "Franchise Advisory Council" to peddle platitudes to franchisee on how Quiznos had their best interest at heart and intended to take action to address the matters outlined in this Complaint when, in fact, the Franchise Advisory Council was a puppet organization that was paid lip service by management.

(k)     When presented with Maximovich's critiques of the problems with costs in the system, Shaffer and Rick Schaden committed to taking action to addressing the problems but never followed through on those commitments.

(l)     Shaffer learned about an internal corporate study done by Quiznos' Brian Smith which demonstrated that nearly fifty percent (50%) of all Quiznos franchises were not profitable and, when confronted with this information, Shaffer instructed Smith to destroy the report.

320.    The purpose of these ongoing communications and actions was to dissuade franchisees, including Plaintiffs, from taking any action, legal or otherwise, to enforce their rights.

321.    Defendants also actively concealed information necessary for Plaintiffs to discover the existence of their claims.  Plaintiffs reasonably relied on the Defendants' actions and omissions in failing to discover the factual and legal basis of their claims.

322.    As a result of Defendants' self-concealing fraud, affirmative misconduct, misrepresentations and omissions, Plaintiffs neither knew, nor could have known in the exercise of reasonable diligence, the basis of their claims until late 2012.  Accordingly, Defendants are estopped from raising any affirmative defenses relying upon any statutes of limitations or contractual limitations periods otherwise applicable to claims asserted herein by Plaintiffs.

**FIRST CLAIM FOR RELIEF:**
VIOLATIONS OF THE COLORADO ORGANIZED CRIME
CONTROL ACT (C.R.S. § 18-17-101 <u>et seq</u>.)

(Fraudulent Scheme To Sell Mandated
Essential Goods At Inflated Prices)

(As to all Defendants)

323.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

324.    By the actions described in paragraphs 3-7 and 211-317, Defendants knowingly executed a scheme to sell the Mandated Essential Goods to defraud Plaintiffs in violation of 18 U.S.C. §§ 1341, 1343, 1344, and 1957, and C.R.S. §§ 18-4-401, 410 & 501, and C.R.S. § 18-5-702.

325.    Defendants were knowingly involved in a pattern of racketeering activity by engaging in over two acts of racketeering activity that were related to the conduct of the enterprise.

326.    Defendants, and their affiliates and subsidiaries that exert control over or influence products, service, materials, and pricing, are an association in fact within the meaning of C.R.S. § 18-17-103(2).

327.    Defendants actions include, but are not limited to the following:  conducing a pattern of racketeering activity, as defined by C.R.S. §§ 18-17-103(5)(a), (b)(II), and (b)(IV), and committing acts of wire and mail fraud and unlawful monetary transactions in violation of 18 U.S.C. §§ 1341, 1343, 1344, 1957, 2314 and 2315.

328.    These actions of racketeering are related in that they had the same purpose, results, participants, victims, and methods of commission.

329.    At least one of these racketeering activities occurred in Colorado after July 1, 1981, and the last of these racketeering activities occurred within ten years after a prior act of racketeering activity.

330.    Defendants knowingly participated, directly or indirectly, in the scheme to sell Mandated Essential Goods through the pattern of racketeering.  Defendants QFA, QFII, QCE Finance, TQM, QIP, TQSC II, QCE Holding, QZF, QCE Incentive, QCE, Q Finance, and QAFT participate, or have participated, in the conduct of the enterprise through the exercise of control over Plaintiffs' purchase of products, services and materials.  They also required Plaintiffs to purchase Mandated Essential Goods several times per year at

prices that they knew to be substantially higher than fair market value and greater than prices for which Plaintiffs could make identical or higher-quality purchases in arm's length transactions from truly independent sources.  The participation in the enterprise by the Cervantes Defendants is, or has been, by their provision of products and services to Plaintiffs through associated affiliates.  Participation in the enterprise by the Schadens, Shaffer, and Meyers is, or has been, though conducting the affairs of the enterprise and making determinations or giving approval to knowingly overcharge Plaintiffs for products, services, and materials, which the enterprise consistently required for operation of the franchise.  The Schadens, Shaffer and Meyers also made and approved decisions that required Plaintiffs to acquire Mandated Essential Goods from "approved" vendors whose prices were known by these Defendants to be inflated beyond fair market value due to the fact that the vendors were required to pay Quiznos or its associated entities kickbacks, mark-ups, and "sourcing fees."  Upon information and belief, participation in the enterprise by Defendants System Services, Services Group, and Mclane (the "**Distributor Defendants**") is, or has been, furthered through selling the Mandated Essential Goods to Plaintiffs without disclosing the AFD mark-ups on the invoices given to Plaintiffs and requiring Quiznos to indemnify them in the event of liability for such intentional nondisclosure.  Indeed, the Distributor Defendants were an integral part of the enterprise as Quiznos and AFD could not have perpetrated the fraudulent scheme alleged in this Complaint without the Distributor Defendants' assistance.  The Distributor Defendants' actions also violate federal law, including but not limited to violations of the Perishable Agricultural Commodities Act, 7 USC § 499(b)(4) and (e).

331.    Defendants' scheme involved numerous individual uses of interstate wire facilities, United States mail, telecommunications systems, and financial transaction equipment, which uses were reasonably foreseeable by the Defendants.  Each specific payment by Plaintiffs for products, services and materials under the scheme was either electronically automatically withdrawn from Plaintiffs' bank accounts or paid for via check sent through the mail.  Plaintiffs received electronic mail and facsimile transmissions sent over interstate wire and telecommunication facilities relating to Defendants' fraudulent overcharging practices.

332.    Defendants knowingly received, or conspired or endeavored to use, proceeds from a pattern of racketeering activity to maintain or operate the enterprise to sell Mandated Essential Goods in violation of C.R.S. §§ 18-17-104(1)(a) and 18-17-104(4).  Defendants funneled the funds derived from their scheme (1) back into the illegal enterprise used to defraud the Plaintiffs; (2) to finance other operations of Quiznos and its affiliated entities; and, upon information and belief (3) to pay debt resulting from the securitization of income from the Mandated Essential Goods.

333.    As a direct and proximate result of this racketeering activity by Defendants, Plaintiffs suffered losses and other compensatory and consequential damages, and continue to suffer damages, to be established at trial, entitling Plaintiffs to treble damages pursuant to C.R.S. § 18-17-106(7).

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

## SECOND CLAIM FOR RELIEF:
### VIOLATIONS OF THE COLORADO ORGANIZED CRIME CONTROL ACT (C.R.S. § 18-17-101 et seq.)

(Fraudulent Scheme To Sell Franchise Agreements)

(As To Defendants QFA, QFII, QCE Finance, TQM, QIP, TQSC II, QCE Holding, QZF, QCE Incentive, QCE, Q Finance, QAFT, The Cervantes Defendants, Rick Schaden, Dick Schaden, Meyers, Shaffer, and John Does 1-50)

334.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

335.    By the actions described above, in paragraphs 3-7 and 211-282, Defendants QFA, QFII, QCE Finance, TQM, QIP, TQSC II, QCE Holding, QZF, QCE Incentive, QCE, Q Finance, QAFT, The Cervantes Defendants, Rick Schaden, Dick Schaden, Meyers, Shaffer, and John Does 1-50 (for purposes of this Claim, the "**COCCA Defendants**") knowingly participated in, or conspired or endeavored to conduct or participate in, the conduct of an enterprise through a pattern of racketeering activity in violation of in violation of C.R.S. § 18-4-401(4).  The COCCA Defendants agreed or conspired to utilize the franchise system to defraud Plaintiffs and induce them to enter into franchise agreements.

336.    The COCCA Defendants were knowingly involved in a pattern of racketeering activity by engaging in over two acts of racketeering activity that were related to the conduct of the enterprise.

337.    The COCCA Defendants, and their affiliates and subsidiaries that utilize, or have utilized, the franchise system to defraud individuals and induce them to enter the franchise system through the use of misrepresentations, incomplete disclosure, and improper omissions, are an association in fact within the meaning of C.R.S. § 18-17-103(2).

338.     The COCCA Defendants actions include, but are not limited to the following: conducing a pattern of racketeering activity, as defined by C.R.S. §§ 18-17-103(5)(a), (b)(II), and (b)(IV), and committing acts of wire and mail fraud and unlawful monetary transactions in violation of 18 U.S.C. §§ 1341, 1343, 1344, 1957, 2314 and 2315.

339.     These actions of racketeering are related in that they had the same purpose, results, participants, victims, and methods of commission.

340.     At least one of these racketeering activities occurred in Colorado after July 1, 1981, and the last of these racketeering activities occurred within ten years after a prior act of racketeering activity.

341.     The COCCA Defendants knowingly participated, directly or indirectly, in the scheme to induce Plaintiffs and others to enter the franchise system through the pattern of racketeering.  Defendants QFA, QFII, QCE Finance, TQM, QIP, TQSC II, QCE Holding, QZF, QCE Incentive, QCE, Q Finance, and QAFT participate, or have participated, in the conduct of the enterprise through inducing the purchase of a franchise by Plaintiffs and thousands of others, by knowingly misrepresenting facts about Quiznos' policies and procedures, about the costs of running a Quiznos franchise, and about the revenues and profit margins that franchisees could expect to receive.  The participation in the enterprise by the Cervantes Defendants is, or has been, by their provision of management services where its managers either approved or made decisions to knowingly induce franchise sales through misrepresentation and deceit. The Schadens, Shaffer and Meyers participation in the enterprise is, or has been, though personally either making or approving of decisions to induce franchise sales through misrepresentation and deceit.

342.     The COCCA Defendants' scheme involved numerous individual uses of interstate wire facilities, United States mail, telecommunications systems, and financial transaction equipment, which uses were reasonably foreseeable by the COCCA Defendants.  The UFOCs, FDDs, and franchise agreements were distributed via United States mail; agents of the COCCA Defendants made and received telephone calls to and from prospective purchasers in which fraudulent misrepresentations or omissions were perpetuated in order to induce entry into franchise agreements, and mail and financial services were used to collect payment from the Plaintiffs and others for the franchise fee.

343.     The COCCA Defendants knowingly received, or conspired or endeavored to use, proceeds from a pattern of racketeering activity to maintain or operate the enterprise to sell additional franchises in violation of C.R.S. §§ 18-17-104(1)(a) and 18-17-104(4).  The COCCA Defendants funneled the funds derived from their scheme (1) back into the

illegal enterprise used to defraud the Plaintiffs; and (2) to finance other operations of Quiznos and its affiliated entities.

344.    As a direct and proximate result of this racketeering activity by the COCCA Defendants, Plaintiffs suffered losses and other compensatory and consequential damages, and continue to suffer damages, to be established at trial, entitling Plaintiffs to treble damages pursuant to C.R.S. § 18-17-106(7).

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

### THIRD CLAIM FOR RELIEF:
VIOLATIONS OF THE COLORADO ORGANIZED CRIME
CONTROL ACT (C.R.S. § 18-17-101 et seq.)

(Unlawful Control Over Franchisees Through
A Pattern Of Racketeering Activity)

(As to all Defendants)

345.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

346.    By the actions described above, in paragraphs 3-7 and 211-317, Defendants knowingly executed a scheme to exert control over franchisees through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1341, 1343, 1344, and 1957, and C.R.S. §§ 18-4-401, 410 & 501, and C.R.S. § 18-5-702.

347.    Defendants were knowingly involved in a pattern of racketeering activity by engaging in over two acts of racketeering activity that were related to the conduct of the enterprise.

348.    Defendants, and their affiliates and subsidiaries that exert control over or influence products, service, materials, and pricing, and thus franchisees, are an association in fact within the meaning of C.R.S. § 18-17-103(2).

349.    Defendants actions include, but are not limited to the following: conducing a pattern of racketeering activity, as defined by C.R.S. §§ 18-17-103(5)(a), (b)(II), and (b)(IV), and committing acts of wire and mail fraud and unlawful monetary transactions in violation of 18 U.S.C. §§ 1341, 1343, 1344, 1957, 2314 and 2315.

350.    These actions of racketeering are related in that they had the same purpose, results, participants, victims, and methods of commission.

351.    At least one of these racketeering activities occurred in Colorado after July 1, 1981, and the last of these racketeering activities occurred within ten years after a prior act of racketeering activity.

352.    Defendants knowingly participated, directly or indirectly, in the scheme to sell Mandated Essential Goods through the pattern of racketeering.  Defendants QFA, QFII, QCE Finance, TQM, QIP, TQSC II, QCE Holding, QZF, QCE Incentive, QCE, Q Finance, and QAFT participate, or have participated, in the conduct of the enterprise through the exercise of control over Plaintiffs' purchase of products, services and materials.  They further required Plaintiffs to purchase Mandated Essential Goods several times per year at prices that they knew to be substantially higher than fair market value and greater than prices for which Plaintiffs could make identical or higher- quality purchases in arm's length transactions from truly independent sources.  The participation in the enterprise by the Cervantes Defendants is, or has been, by their provision of products and services to Plaintiffs through associated affiliates.  Participation in the enterprise by the Schadens, Shaffer, and Meyers is, or has been, though conducting the affairs of the enterprise and making determinations or giving approval to knowingly overcharge Plaintiffs for products, services, and materials, which the enterprise consistently required for operation of the franchise.  The Schadens, Shaffer and Meyers also made and approved decisions that required Plaintiffs to acquire Mandated Essential Goods from "approved" vendors whose prices were known by these Defendants to be inflated beyond fair market value due to the fact that the vendors were required to pay Quiznos or its associated entities kickbacks, mark-ups, and "sourcing fees."  Upon information and belief, participation in the enterprise by the Distributor Defendants is, or has been, furthered through selling the Mandated Essential Goods to Plaintiffs without disclosing the AFD mark-ups on the invoices given to Plaintiffs and requiring Quiznos to indemnify them in the event of liability for such intentional nondisclosure.  Indeed, the Distributor Defendants were an integral part of the enterprise as Quiznos and AFD could not have perpetrated the fraudulent scheme alleged in this Complaint without the Distributor Defendants' assistance.  The Distributor Defendants' actions also violate federal law, including but not limited to violations of the Perishable Agricultural Commodities Act, 7 USC § 499(b)(4) and (e).

353.    Through these various schemes, Defendants knowingly maintained control over the Quiznos franchisees and, in particular, the Plaintiffs, in violation of C.R.S. § 18-17-104(3).

354.    Defendants' scheme involved numerous individual uses of interstate wire facilities, United States mail, telecommunications systems, and financial transaction equipment, which uses were reasonably foreseeable by the Defendants.    Each specific payment by Plaintiffs for products, services and materials under the scheme were either

automatically withdrawn from Plaintiffs' bank accounts or paid for via check sent through the mail.  Plaintiffs received electronic mail and facsimile transmissions sent over interstate wire and telecommunication facilities relating to Defendants' fraudulent overcharging practices and mandated pricing policies for sale- side pricing.

355.    Defendants knowingly received, or conspired or endeavored to use, proceeds from a pattern of racketeering activity to maintain or operate the enterprise to sell Mandated Essential Goods in violation of C.R.S. §§ 18-17-104(1)(a) and 18-17-104(4). Defendants funneled the funds derived from their scheme (1) back into the illegal enterprise used to defraud the Plaintiffs, and (2) to finance other legal operations of Quiznos and its affiliated entities.

356.    As a direct and proximate result of this racketeering activity by Defendants, Plaintiffs suffered losses and other compensatory and consequential damages, and continue to suffer damages, to be established at trial, entitling Plaintiffs to treble damages pursuant to C.R.S. § 18-17-106(7).

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

### FOURTH CLAIM FOR RELIEF:
VIOLATION OF THE COLORADO CONSUMER
PROTECTION ACT (C.R.S. § 6-1-101 et seq.)

(Sale of Franchises)

(As to Defendants QFA, QFII, QCE Finance, TQM, QIP,
TQSC II, QCE Holding, QZF, QCE Incentive, QCE, Q Finance,
QAFT, The Cervantes Defendants, Rick Schaden, Dick
Schaden, Meyers, Shaffer, and John Does 1-50)

357.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

358.    As alleged with specificity in this Complaint, in paragraphs 190-201 and 242-282, Defendants QFA, QFII, QCE Finance, TQM, QIP, TQSC II, QCE Holding, QZF, QCE Incentive, QCE, Q Finance, QAFT, The Cervantes Defendants, Rick Schaden, Dick Schaden, Meyers, Shaffer, and John Does 1-50 (the "**CCPA Defendants**") engaged in unfair and deceptive trade practices in their relationship with Plaintiffs.

359.    The deceptive trade practices include, but are not limited to:  advertising the franchises with intent not to sell them as advertised (C.R.S. § 6-1-105(i)); making false and misleading statements of fact concerning the price of goods and services (C.R.S. § 6-

56

1-105(l)); requiring undisclosed conditions to be met before selling the advertised goods, property or services (C.R.S. § 6-1-105(n)); failure to disclose material information concerning the franchises that was known to the CCPA Defendants at the time of the sale and was intended to induce Plaintiffs to enter into the transaction (C.R.S. § 6-1-105(u)); and knowingly making false representations as to the source, sponsorship, approval or certification of goods, services or property (C.R.S. § 6-1-105(a)).

360.     The CCPA Defendants engaged in these deceptive trade practices in bad faith.

361.     The Cervantes Defendants, Rick Schaden, Dick Schaden, Meyers, and Shaffer, also caused the Quiznos Defendants to engage in deceptive trade practices.  Upon information and belief, they participated in the deceptive practices alleged in this Complaint by overseeing, directing and otherwise ratifying the actions of the corporations they control.

362.     The deceptive trade practices described in this Complaint occurred in the course of the CCPA Defendants' business and, in the case of the Schadens, Shaffer, Meyers, as part of their occupation as officers and directors of the various corporate Defendants.

363.     The deceptive trade practices alleged in this Complaint significantly impacted the public as actual or potential consumers of the CCPA Defendants' goods and services.  The CCPA Defendants' conduct in selling franchises and in its relationship with franchisees subsequent to entry of the franchise agreements resulted in a significant and detrimental impact on members of the public.  The Colorado Consumer Protection Act provides protection to those affected by pre- and post-sale deceptions in consumer relationships.

364.     Plaintiffs were actual consumers of the CCPA Defendants' goods and services and were injured, and will continue to suffer injury, in the course of their business and occupation as a result of the CCPA Defendants' deceptive trade practices and their violation of the CCPA.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

DMWEST #9515037 v1

## FIFTH CLAIM FOR RELIEF:
VIOLATION OF THE CONSUMER PROTECTION ACT
(C.R.S. § 6-1-101 et seq.)

(Sale of Goods and Services)

(As to Defendants System Services,
Services Group, and McLane)

365.    Plaintiffs hereby incorporate all other allegations from this Complaint as though
set forth in full.

366.    As alleged with specificity in this Complaint, in paragraphs 161-188 and 214-241,
Defendants System Services, Services Group, and McLane (the "**Distributor
Defendants**") engaged in unfair and deceptive trade practices in their relationship with
Plaintiffs.

367.    The deceptive practices include but are not limited to:  knowingly making false
representations as to the source of goods (C.R.S. § 6-1-105(b)); knowingly making false
representations as to the Distributor Defendants' affiliation, connection, or association
with AFD (C.R.S. § 6-1-105(c) & (e)); making false and misleading statements of fact
concerning the price of goods sold to Plaintiffs (C.R.S. § 6-1-105(l)); failure to disclose
material information concerning the sale of the goods to Plaintiffs, which information
was known to the Distributor Defendants at the time of the sales and the nondisclosure
of which was intended to induce Plaintiffs to enter into the transactions (C.R.S. § 6-1-
105(u)).

368.    The Distributor Defendants engaged in these deceptive trade practices in bad
faith, and also caused Quiznos and AFD to engage in deceptive trade practices.

369.    The deceptive trade practices described in this Complaint occurred in the course
of the Distributor Defendants' business.

370.    The deceptive trade practices alleged in this Complaint significantly impacted
the public as actual or potential customers of the Distributor Defendants' goods and
services.  The Distributor Defendants' conduct in selling the Mandated Essential Goods
and in its ongoing relationship with franchisees resulted in a significant and detrimental
impact on members of the public.  The Colorado Consumer Protection Act provides
protection to those affected by pre- and post-sale deceptions in consumer relationships.

371.    Plaintiffs are actual consumers of the Distributor Defendants' goods and services
and were injured, and will continue to suffer injury, in the course of their business as a

result of the Distributor Defendants' deceptive trade practices and their violation of the CCPA.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

**SIXTH CLAIM FOR RELIEF:**
CONSPIRACY TO VIOLATE THE COLORADO
CONSUMER PROTECTION ACT (C.R.S. § 6-1-101 <u>et seq.</u>)

(As to all Defendants)

372.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

373.    As set forth in the Fourth and Fifth Claims for Relief, the CCPA Defendants and the Distributor Defendants, in bad faith, engaged in unfair and deceptive trade practices in violation of the Colorado Consumer Protection Act (C.R.S. § 6-1-101 <u>et seq.</u>).

374.    Upon information and belief, all Defendants except the Distributor Defendants conspired together at various times to violate the CCPA and engage in unfair and deceptive trade practices by selling franchises to Plaintiffs.

375.    Upon information and belief, all Defendants conspired together at various times to violate the CCPA and engage in unfair and deceptive trade practices by selling goods and services to Plaintiffs.

376.    Upon information and belief, these agreements were furthered by one or more unlawful, overt act intentionally performed by the conspirators, including but not limited to making, ordering, and approving the misrepresentations to Plaintiffs regarding the Franchise Agreements as well as the source, price and quality of the Mandated Essential Goods, and/or knowingly providing or ordering the provision of Mandated Essential Goods of which the Distributor Defendants had misrepresented the source, price and quality.

377.    Plaintiffs were damaged, and continue to suffer damages, as a direct and proximate result of Defendants' conspiracy and acts in furtherance of the conspiracy.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

**SEVENTH CLAIM FOR RELIEF:**
AIDING AND ABETTING VIOLATIONS OF THE
COLORADO CONSUMER PROTECTION ACT
(C.R.S. § 6-1-101 <u>et seq</u>.)

(As to all Defendants)

378.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

379.    As set forth in the Fourth and Fifth Claims for Relief, the CCPA Defendants and Distributor Defendants, in bad faith, engaged in, and conspired to engage in, unfair and deceptive trade practices in violation of the CCPA. (C.R.S. § 6-1-101 <u>et seq</u>.)

380.    All Defendants except the Distributor Defendants aided and abetted in the commission of the unfair and deceptive trade practices as to the sale of franchises to Plaintiffs.

381.    All Defendants aided and abetted in the commission of the unfair and deceptive trade practices as to the sale of goods and services to Plaintiffs.

382.    All Defendants knowingly participated in and provided substantial assistance towards the deceptive trade practices by, among other things, receiving and/or dispersing funds taken from Plaintiffs as a result of the unfair and deceptive trade practices.

383.    As a direct and proximate result of Defendants' aiding and abetting, Plaintiffs have been damaged, and continue to suffer damages, in amounts to be proven at trial.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

DMWEST #9515037 v1

## **EIGHTH CLAIM FOR RELIEF:**
BREACH OF CONTRACT

(As To Defendants QFA, QFII, QCE Finance, TQM, QIP,
TQSC II, QCE Holding, QZF, QCE Incentive, QCE,
Q Finance, QAFT, and John Does 1-50)

384.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

385.    Each franchise agreement alleged to have been executed in this Complaint constitutes a contract binding on Defendants QFA, QFII, QCE Finance, TQM, QIP, TQSC II, QCE Holding, QZF, QCE Incentive, QCE, Q Finance, and QAFT (the "**Contract Defendants**").  Quiznos expressly incorporates its UFOCs into each franchise agreement and thereby binds itself to its terms.  In each franchise agreement alleged to exist in this case, the parties agreed as follows:

> C)  NO STATEMENT, REPRESENTATION, OR OTHER ACT, EVENT, OR COMMUNICATION, EXCEPT AS **SET FORTH IN THIS DOCUMENT AND IN ANY OFFERING CIRCULAR SUPPLIED TO FRANCHISEE,** IS BINDING ON FRANCHISOR IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

(Franchise Agreement, ¶ 23.12(C)) (Emphasis added).

386.    Section 8 of the UFOC[s] given to the Plaintiffs provide that Quiznos would "negotiate purchase agreements with suppliers for the benefit of Franchisee, which often include volume discounts." (emphasis added).  By improperly using their control over the Suppliers and the Distributor Defendants from whom Quiznos requires franchisees to purchase the Mandated Essential Goods, the Contract Defendants failed to use their buying power to obtain volume purchases for the benefit of the Plaintiffs.  The Contract Defendants breached their contractual obligation to negotiate purchase arrangements with suppliers for the benefit of the Plaintiffs and, in fact, established myriad relationships with affiliated vendors and suppliers that insured inflated prices for Mandated Essential Goods.

387.    The Contract Defendants have further breached their contractual obligations to Plaintiffs by, among other things: (a) failing to provide promised support and assistance in operating franchises; (b) failing to properly appropriate and apply advertising and marketing funds as required by the franchise agreement; and (c) increasing the cost of the fees paid to the marketing and advertising fund by imposition of coupons in the

public market and not reimbursing Plaintiffs for the costs associated with honoring those coupons.

388.    The breaches of contract alleged herein directly and proximately caused Plaintiffs' harm.

389.    By reason of the Contract Defendants' breaches as alleged herein, Plaintiffs have been damaged, and continue to suffer damages, in amounts to be proven at trial.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

**NINTH CLAIM FOR RELIEF**:
BREACH OF CONTRACT

(Breach of The Implied Covenant
of Good Faith And Fair Dealing)

(As To Defendants QFA, QFII, QCE Finance, TQM, QIP,
TQSC II, QCE Holding, QZF, QCE Incentive, QCE,
Q Finance, QAFT, and John Does 1-50)

390.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

391.    The franchise agreements between Plaintiffs and the Contract Defendants include not only express written provisions, but also those terms and conditions which, although not formally expressed, are implied by law.  Such implied terms are as binding as the terms actually written in the agreement.

392.    Inherent in all contracts is an implied covenant that the parties will act in good faith and deal fairly with each other in the performance of their respective obligations under the contract.  The Contract Defendants maintain discretionary authority to determine certain terms under the Franchise Agreement, including the price at which all Mandated Essential Goods would be sold to the Plaintiffs, and are therefore bound to exercise their discretion in good faith.

393.    The Contract Defendants have breached their duty under the covenant of good faith and fair dealing by systematically and repeatedly abusing their discretion to act according to the reasonable expectations of the Plaintiffs and therefore deprived the Plaintiffs of the benefit of the contract.

394.    The Contract Defendants maintain near unilateral discretion in the implementation and enforcement of Quiznos' franchise agreements, UFOCs, FDDs, and

Operations Manual.  This discretion includes, but is not limited to, setting and changing standards and specifications for services and products, designating suppliers, and negotiating and setting prices.  The obligations of the Contract Defendants to abide by the implied covenant of good faith and fair dealing are heightened by this substantial imbalance of power between the Contract Defendants and Plaintiffs, which allows the Contract Defendants to implement the fraudulent scheme described in detail in this Complaint and incorporated by reference.

395.    The Contract Defendants breached the implied covenant of good faith and fair dealing by virtue of the deceptive practices described herein and by their bad faith exercise of discretion over certain terms of the franchise agreements, including but not limited to the prices of the Mandated Essential Goods.  The Contract Defendants have denied Plaintiffs the ability to achieve their reasonable expectations in entering into the franchise relationship, which include without limitation the reasonable expectations that the Contract Defendants and their affiliates would negotiate volume discounted prices for the benefit of the Plaintiffs and would not set unreasonable or untenable prices for the Mandated Essential Goods.

396.    The Contract Defendants' breach of the implied covenant of good faith and fair dealing caused, and continues to cause Plaintiffs damage in an amount to be proven at trial.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

DMWEST #9515037 v1

## TENTH CLAIM FOR RELIEF:
BREACH OF CONTRACT

(Breach of The Implied Covenant
of Good Faith And Fair Dealing)

(As to Defendants System Services,
Services Group, and McLane)

397.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

398.    The contracts and invoices governing the sale and purchase of Mandated Essential Goods between Plaintiffs and the Distributor Defendants include not only express written provisions, but also those terms and conditions which, although not formally expressed, are implied by law.  Such implied terms are as binding as the terms actually written in the agreement.

399.    Inherent in all contracts is an implied covenant that the parties will act in good faith and deal fairly with each other in the performance of their respective obligations under the contract.  The Distributor Defendants maintain discretionary authority to determine certain terms under the invoices and contracts, including the price at which all Mandated Essential Goods would be sold to the Plaintiffs, and are therefore bound to exercise their discretion in good faith.

400.    The Distributor Defendants have breached their duty under the covenant of good faith and fair dealing by systematically and repeatedly abusing their discretion to act according to the reasonable expectations of the Plaintiffs and therefore deprived the Plaintiffs of the benefit of the contract.

401.    The Distributor Defendants maintain near unilateral discretion in the implementation and enforcement of the prices at which the Mandated Essential Goods are sold and delivered to Plaintiffs.  This discretion includes, but is not limited to, maintaining the websites from which Plaintiffs order the Mandated Essential Goods, setting the prices of the Mandated Essential Goods, and creating the invoices given to Plaintiffs for the sale of the Mandated Essential Goods.  The obligations of the Distributor Defendants to abide by the implied covenant of good faith and fair dealing are heightened by this substantial imbalance of power between the Distributor Defendants and Plaintiffs, which allowed the Distributor Defendants to implement the scheme described in detail in this Complaint and incorporated by reference.

DMWEST #9515037 v1

402.    The Distributor Defendants breached the implied covenant of good faith and fair dealing by virtue of the deceptive practices described herein and by their bad faith exercise of discretion over certain terms of the invoices and purchasing agreements with Plaintiffs, including but not limited to setting the prices of the Mandated Essential Goods.  The Distributor Defendants have denied Plaintiffs the ability to achieve their reasonable expectations in entering into the relationship, which include without limitation the reasonable expectations that the Distributor Defendants would sell the Mandated Essential Goods at prices better than the prices at which the Distributor Defendants would sell the same goods to similarly situated purchasers at the same time.

403.    The Distributor Defendants' breach of the implied covenant of good faith and fair dealing caused, and continues to cause Plaintiffs damage in an amount to be proven at trial.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

## ELEVENTH CLAIM FOR RELIEF:
UNJUST ENRICHMENT

(As to All Defendants)

404.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

405.    By unknowingly paying supra-competitive prices for the Mandated Essential Goods, Plaintiffs conferred benefits upon the Defendants that the Defendants received solely by virtue of Quiznos' failure to fulfill its promise to negotiate prices for the benefits of the franchisee.

406.    The Defendants maintain knowledge and appreciation of the benefits conferred upon them by Plaintiffs.

407.    Under the circumstances alleged in this Complaint, it would be inequitable for Defendants to accept and retain these benefits without paying the value thereof.  The benefits provided include money paid directly to Defendants and to others on Defendants' behalf and money taken from Plaintiffs accounts without notice to Plaintiffs.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

**TWELFTH CLAIM FOR RELIEF:**
FRAUD IN THE INDUCEMENT

(Intentional Misrepresentation And Concealment)

(As To Defendants QFA, QFII, TQSC II, and John Does 1-50)

408.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

409.    As alleged with specificity in this Complaint in paragraphs 190-201 and 282, Defendants QFA, QFII, TQSC II, and John Does 1-50 or their predecessors in interest (the "**Original Contracting Defendant**") knowingly and intentionally made false statements of past and present fact to, and omitted or concealed true statements of fact from, the Plaintiffs.  The Original Contracting Defendant's false statements created an untrue and misleading impression in the mind of Plaintiffs.  With respect to each such true statement alleged to have been omitted or concealed by the Original Contract Defendant, the Original Contracting Defendant owed Plaintiffs a duty to disclose the truth of such omitted or concealed fact.

410.    These facts were material in Plaintiffs' decision to acquire a Quiznos franchise because a reasonable person under the circumstances would regard the facts misrepresented and otherwise omitted as important in deciding to purchase a Quiznos franchise.  The Original Contracting Defendant knew that Plaintiffs would find the misrepresented and omitted facts to be important in deciding how to proceed.

411.    The Original Contracting Defendant concealed these facts with the intent of creating a false impression of the actual facts in Plaintiffs' mind and knowing Plaintiffs would not have taken the course of action they did had they been told all of the facts.

412.    The statements and omissions of the Original Contracting Defendant as alleged herein were untrue.  The Original Contracting Defendant knew or should have known at the time it made the representations and omissions that its affirmative statements as alleged herein were false, and that its omissions or concealments were deceptive by virtue of being incomplete.

413.    The Original Contracting Defendant made the false statements, and engaged in the omissions and concealments, with the intent to defraud the Plaintiffs and in order to induce the Plaintiffs to rely on the statements, omissions and concealments.

414.    Plaintiffs believed the false statements made by the Original Contracting Defendant, or believed that no facts existed inconsistent with the Original Contract Defendant's omissions and concealments, and reasonably acted in reliance upon those

66

beliefs to their detriment.  Among other things, Plaintiffs executed the franchise agreements, delayed abandoning their doomed franchises, loaned money to the franchises, and borrowed money from their retirement fund.

415.    As a result of their detrimental reliance on the Original Contract Defendant's fraudulent statements and omissions, Plaintiffs have been damaged, and continue to suffer damages, in an amount to be proven at trial.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

**THIRTEENTH CLAIM FOR RELIEF:**
CONSPIRACY TO COMMIT FRAUD IN THE INDUCEMENT

(As to Defendants QFA, QFII, QCE Finance, TQM, QIP,
TQSC II, QCE Holding, QZF, QCE Incentive, QCE, Q Finance,
QAFT, AFD, Source One, S&S Equip., Ba-Bing, Chain
Management, Kinetic Sourcing, Continental, CLG, The
Cervantes Defendants, Rick Schaden, Dick Schaden, Meyers,
Shaffer, and John Does 1-50)

416.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

417.    As set forth in the Twelfth Claim for Relief and with specificity elsewhere in this Complaint, the Original Contracting Defendant engaged in fraud and intentionally misrepresented and omitted material facts in order to induce Plaintiffs to enter into a Quiznos franchise agreement.

418.    Defendants QCE Finance, TQM, QIP, QCE Holding, QZF, QCE Incentive, QCE, Q Finance, QAFT, AFD, Source One, S&S Equip., Ba-Bing, Chain Management, Kinetic Sourcing, Continental, CLG, The Cervantes Defendants, Rick Schaden, Dick Schaden, Meyers, Shaffer, and/or John Does 1-50 agreed and conspired with the Original Contracting Defendant to fraudulently induce Plaintiffs to enter into a Quiznos franchise agreement.

419.    The agreement and conspiracy was furthered by one or more unlawful, overt acts intentionally performed by the conspirators, including but not limited to making, approving and/or ordering the misstatements and omissions.

420.    Plaintiffs were damaged, and continue to suffer damage, in amounts to be proven at trial as direct and proximate result of this conspiracy and acts in furtherance of the conspiracy.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

<u>**FOURTEENTH CLAIM FOR RELIEF:**</u>
AIDING AND ABETTING FRAUD IN THE INDUCEMENT

(As to Defendants QFA, QFII, QCE Finance, TQM, QIP, TQSC II, QCE Holding, QZF, QCE Incentive, QCE, Q Finance, QAFT, AFD, Source One, S&S Equip., Ba-Bing, Chain Management, Kinetic Sourcing, Continental, CLG, The Cervantes Defendants, Rick Schaden, Dick Schaden, Meyers, Shaffer, and John Does 1-50)

421.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

422.    As set forth in the Twelfth Claim for Relief and with specificity elsewhere in the Complaint, the Original Contract Defendant engaged in fraud and intentionally misrepresented and omitted material facts in order to induce Plaintiffs to enter into a Quiznos franchise agreement.

423.    Defendants QCE Finance, TQM, QIP, QCE Holding, QZF, QCE Incentive, QCE, Q Finance, QAFT, AFD, Source One, S&S Equip., Ba-Bing, Chain Management, Kinetic Sourcing, Continental, CLG, The Cervantes Defendants, Rick Schaden, Dick Schaden, Meyers, Shaffer, and John Does 1-50 aided and abetted the Original Contracting Defendant in the fraud perpetrated against the Plaintiffs.

424.    Defendants QCE Finance, TQM, QIP, QCE Holding, QZF, QCE Incentive, QCE, Q Finance, QAFT, AFD, Source One, S&S Equip., Ba-Bing, Chain Management, Kinetic Sourcing, Continental, CLG, The Cervantes Defendants, Rick Schaden, Dick Schaden, Meyers, Shaffer, and John Does 1-50 knowingly participated in and provided substantial assistance to the Original Contracting Defendant toward the fraud by, among other things, making, approving or ordering the intentional misrepresentations and omissions.

425.    As a direct and proximate result of this aiding and abetting, Plaintiffs have been damaged, and continue to suffer damage, in amounts to be proven at trial.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

## FIFTEENTH CLAIM FOR RELIEF:
PROMISSORY FRAUD

(As To Defendants QFA, QFII, TQSC II, and John Does 1-50)

426.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

427.    The representation that Quiznos would negotiate volume-discounted prices on Mandated Essential Goods for the benefit of franchisees which was made to Plaintiffs at or before the time the Original Contracting Defendant sold the franchises to Plaintiffs was false.  At the time the Original Contracting Defendant made the representation, it had the intention not to perform the act promised and, in fact, fully intended to negotiate prices in a manner that ensured that Quiznos and their affiliates were the sole beneficiaries of the negotiated volume discounts, at the expense of the Plaintiffs.  The Original Contracting Defendant knew at the time of making the representations that the representation in the UFOC was false.

428.    The Original Contracting Defendant intended to deceive Plaintiffs into believing that a nationwide franchise system like Quiznos would exercise its bulk "buying power" to ensure volume discounts in the acquisition of the Mandated Essential Goods. The intent of making the representation was to induce Plaintiffs' reliance on this common sense proposition and to obtain Plaintiffs' assent to the franchise agreements.

429.    Plaintiffs reasonably relied on the UFOC and the other representations set forth in this Complaint in choosing to purchase a Quiznos franchise.

430.    As a direct and proximate result of such reliance, Plaintiffs suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

### SIXTEENTH CLAIM FOR RELIEF:
CONSPIRACY TO COMMIT PROMISSORY FRAUD

(As to Defendants, QFA, QFII, QCE Finance, TQM, QIP,
TQSC II, QCE Holding, QZF, QCE Incentive, Q Finance,
QAFT, AFD, Source One, S&S Equip., Ba-Bing, Chain
Management, Kinetic Sourcing, Continental, CLG, The
Cervantes Defendants, Rick Schaden, Dick Schaden, Meyers,
Shaffer, and John Does 1-50)

431.    Plaintiffs hereby incorporate all other allegations from this Complaint as though
set forth in full.

432.    As set forth in the Fifteenth Claim for Relief and with specificity elsewhere in this
Complaint, the Original Contracting Defendant engaged in fraud and, with no intention
to perform its promise, intentionally misrepresented that it would negotiate volume
discounted prices for the benefit of franchisees to induce Plaintiffs to enter into a
Quiznos franchise agreement.

433.    Defendants QCE Finance, TQM, QIP, QCE Holding, QZF, QCE Incentive, Q
Finance, QAFT, AFD, Source One, S&S Equip., Ba-Bing, Chain Management, Kinetic
Sourcing, Continental, CLG, The Cervantes Defendants, Rick Schaden, Dick Schaden,
Meyers, Shaffer, and John Does 1-50 agreed, approved of, and conspired with the
Original Contracting Defendant to perpetrate the fraud against the Plaintiffs.

434.    The agreement was furthered by one or more unlawful, overt acts intentionally
performed by the conspirators, including but not limited to making, approving and/or
ordering the fraudulent misrepresentations.

435.    Plaintiffs were damaged in amounts to be proven at trial as a direct and
proximate result of this conspiracy and acts in furtherance of the conspiracy.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

## SEVENTEENTH CLAIM FOR RELIEF:
AIDING AND ABETTING PROMISSORY FRAUD

(As to Defendants, QFA, QFII, QCE Finance, TQM, QIP,
TQSC II, QCE Holding, QZF, QCE Incentive, Q Finance,
QAFT, AFD, Source One, S&S Equip., Ba-Bing, Chain
Management, Kinetic Sourcing, Continental, CLG, The
Cervantes Defendants, Rick Schaden, Dick Schaden, Meyers,
Shaffer, and John Does 1-50)

436.    Plaintiffs hereby incorporate all other allegations from this Complaint as though
set forth in full.

437.    As set forth in the Fifteenth Claim for Relief and with specificity elsewhere in the
Complaint, the Original Contracting Defendant engaged in promissory fraud and, with
no intention to perform its promise, intentionally misrepresented that it would
negotiate volume discounted prices for the benefit of franchisees to induce Plaintiffs to
enter into a Quiznos franchise agreement.

438.    Defendants QCE Finance, TQM, QIP, QCE Holding, QZF, QCE Incentive, Q
Finance, QAFT, AFD, Source One, S&S Equip., Ba-Bing, Chain Management, Kinetic
Sourcing, Continental, CLG, The Cervantes Defendants, Rick Schaden, Dick Schaden,
Meyers, Shaffer, and John Does 1-50 (for purposes of this claim, the "**Aiding
Defendants**") agreed, aided and abetted in the fraud perpetrated against the Plaintiffs.

439.    The Aiding Defendants knowingly participated in and provided the Original
Contracting Defendant with substantial assistance towards the fraud by, among other
things, making, approving or ordering the fraudulent misrepresentations.

440.    The Aiding Defendants knowingly participated in and provided the Original
Contracting Defendant with substantial assistance towards the fraud by, among other
things, supporting and assisting the making of misrepresentations.

441.    As a direct and proximate result of the Aiding Defendants' aiding and abetting,
Plaintiffs have been damaged in amounts to be proven at trial.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

DMWEST #9515037 v1

## EIGHTEENTH CLAIM FOR RELIEF:
FRAUD (By False Representations)

(As to all Defendants)

442.     Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

443.     As alleged with specificity in this Complaint in paragraphs 161-188, 214-241, 283-322, and as alleged generally elsewhere, after Plaintiffs were fraudulently induced to become a Quiznos franchisee, Defendants continued to make numerous false representations of past and present facts to Plaintiffs, each of which was material, including but not limited to the following:  that Quiznos and its affiliates were not charging mark-ups on the Mandated Essential Goods, that the prices of the Mandated Essential Goods were fair, that the prices the Distributor Defendants charged Plaintiffs for the Mandated Essential Goods were better than the prices the Distributor Defendants would charge to similarly situated purchasers who bought the same goods at the same time, that Quiznos and its affiliates were negotiating volume discounted prices for the Plaintiffs' benefit, and that Quiznos and its affiliates were using the advertising fund for proper purposes and were not increasing couponing and other discount programs in order to increase the amount of Mandated Essential Goods sold to Plaintiffs.

444.     The Distributor Defendants' actions also violate federal law, including but not limited to violations of the Perishable Agricultural Commodities Act, 7 USC § 499(b)(4) and (e).

445.     Defendants either knew that each of these representations as false at the time each representations was made, or Defendants were aware that they did know whether the representations were true or false.

446.     Defendants made these false representations with the intent that Plaintiffs would rely on the representations to Plaintiffs detriment.

447.     Plaintiffs did rely on those representations, which reliance was justified.

448.     As a direct and proximate result of Plaintiffs' reliance on Defendants' false and misleading representations, Plaintiffs have been damaged in amounts to be proven at trial.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

DMWEST #9515037 v1

## NINETEENTH CLAIM FOR RELIEF:

FRAUD (By Nondisclosure and Concealment)

(As to all Defendants)

449.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

450.    As alleged with specificity in this Complaint in paragraphs 161-188, 214-241, 283-322, and as alleged generally elsewhere, after Plaintiffs were fraudulently induced to execute the Franchise Agreements and become a Quiznos franchisee, Defendants concealed and failed to disclose numerous past and present facts which Defendants had a duty to disclose, each of which was material, including but not limited to the following:  that Quiznos and its affiliates were not negotiating volume discounted prices for the Plaintiffs' benefit, that AFD and the AFD-Related Entities were charging mark-ups on the Mandated Essential Goods before the Distributor Defendants resold the Mandated Essential Goods to the Plaintiffs, that the majority of Quiznos franchisees were losing money or barely breaking even, that the Schaden Ownership Group encumbered Quiznos with nearly $870 million in debt, leaving Quiznos nearly insolvent, and then transferred the proceeds from that $870 million debt to themselves to Plaintiffs' detriment, and that Quiznos and its affiliates were improperly using the advertising fund by increasing couponing and other discount programs to increase the amount of Mandated Essential Goods sold to Plaintiffs, thereby increasing AFD's hidden profits.

451.    The Distributor Defendants' actions also violate federal law, including but not limited to violations of the Perishable Agricultural Commodities Act, 7 USC § 499(b)(4) and (e).

452.    Defendants concealed these and other material facts with the intent of creating a false impression of the actual facts in the mind of the Plaintiffs.

453.    Defendants concealed these material facts with the intent that Plaintiffs take a course of action that Plaintiffs might not have taken, including purchasing additional franchises and not terminating the franchise agreements or seeking other legal relief, if Plaintiffs knew the actual facts.

454.    Plaintiffs took or refrained from taking such actions relying on the assumption that the concealed facts did not exist or were different from what those facts actually were, which reliance was justified.

455.    As a direct and proximate result of Plaintiffs' reliance on Defendants' active and ongoing concealment of material facts, Plaintiffs have been damaged in amounts to be proven at trial.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

## <u>TWENTIETH CLAIM FOR RELIEF:</u>
NEGLIGENT MISREPRESENTATION

(As To All Defendants)

456.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

457.    As set forth with specificity in paragraphs 190-201, and 211-317 of this Complaint and as alleged generally elsewhere, Defendants gave false and misleading information to Plaintiffs including, but not limited to the following:  that Quiznos' affiliates would negotiate volume discounts with Suppliers for the Plaintiffs' benefit, that Quiznos would pass along all volume discounts to Plaintiffs, that the prices the Distributor Defendants charged Plaintiffs for the Mandated Essential Goods were better than the prices the Distributor Defendants were charging similarly situated purchasers who bought the same goods at the same time, and that Quiznos was utilizing the advertising funds for the Plaintiffs' benefit and was not issuing excessive coupons and other discount programs.

458.    The false and misleading information that Defendants gave to Plaintiffs was transmitted in the course of Defendants' business and was made with the intent to induce Plaintiffs to enter into business transactions in which Defendants had a financial interest.

459.    Defendants gave the information directly to Plaintiffs for their use in business transactions with the Defendants and/or gave the information to third parties knowing that the third parties intended to supply the false information to Plaintiffs and would use the false information to influence Plaintiffs to enter into business transactions with Defendants.

460.    Defendants were negligent in communicating the information and gave the information with the intent that it would create a false impression of the true facts in the mind of Plaintiffs such that Plaintiffs would act in reliance on the information.

DMWEST #9515037 v1

461.    Plaintiffs relied on the information supplied by Defendants, and, as a direct and proximate result of Defendants' negligent misrepresentation of false information to Plaintiffs, Plaintiffs have been damaged in amounts to be proven at trial.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

**TWENTY-FIRST CLAIM FOR RELIEF**:
DECLARATORY JUDGMENT
("Illusory Contract")

(As To All Defendants except the Distributor Defendants)

462.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

463.    The franchise agreement purports to limit Plaintiffs' damages to an amount equal to Plaintiffs' profits from the year prior to any breach of the agreement.  Plaintiffs earned little or no profits.  Quiznos knew at the time it executed each franchise agreement that the Quiznos' economic model effectively precluded Plaintiffs from ever operating at a profit.  Due to the way Quiznos has structured the franchise relationship, franchisee profitability is an event wholly under the control and discretion of the Defendants.

464.    The promise to provide damages to Plaintiffs in the event of breach is therefore illusory, and such provision of the franchise agreement is null and void.

465.    Plaintiffs are therefore entitled to a declaration from the Court that these provisions of the Quiznos franchise agreements signed by Plaintiffs are void and unenforceable.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

DMWEST #9515037 v1

## TWENTY-SECOND CLAIM FOR RELIEF:
DECLARATORY JUDGMENT
("Unconscionable Contract")

### (As to All Defendants except the Distributor Defendants)

466.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

467.    An actual and justifiable controversy exists between Defendants and Plaintiffs concerning the parties' respective rights and obligations under the franchise agreements and UFOCs and whether Quiznos should be held liable for alleged misconduct during the relationship between the parties.

468.    In addition to the extremely one-sided operational and approval terms included in the adhesive form franchise agreements, Quiznos has included unconscionable procedural obstacles, which intend to discourage claims against it and/or attempt to shield it from any liability.

469.    These unconscionable provisions from the franchise agreements, among others, are unenforceable as a matter of Colorado Law:

(a)    Unreasonably truncate any statutes of limitation that may apply to a franchisee's legal claims.

(b)    Disclaim any responsibility for the effect of Quiznos' decisions and actions on a franchisee's viability.

(c)    Restrict the ability of franchisee to litigate in their home states and require litigation in Denver, Colorado.

(d)    Prohibit consolidation with other franchisee to press similar claims.

(e)    Bar franchisee from bringing a class action.

(f)    Deprive Plaintiffs' of their right to a jury trial.

(g)    Prohibit Plaintiffs from suing Quiznos for violating the implied covenant of good faith and fair dealing that Colorado law injects into every contract.

(h)    Prohibit claims against any affiliate, employee, director or officer of the franchisor even where those parties have engaged in illegal conduct.

(i)     Impose the application of Colorado Law in all circumstances, no matter the locale of the franchisee or the nature of the alleged wrongdoing at issue between the parties.

(j)     Unilaterally limit a franchisee's damages "in a maximum amount equal to the net profits of the Restaurant for the year prior" (typically zero profits, so altogether eliminating any contractual right to claim damages).

(k)     Reserve for itself the right to sue the franchisee for 15 years' worth of lost royalties and marketing fees after the franchise fails.

(l)     Prohibit the recovery of punitive or exemplary damages.

(m)     Prohibit the use of "course of dealing" evidence to "explain, modify or contradict" the franchise agreement.

470.     The collective inclusion of all of these onerous provisions in the adhesive franchise agreement violates public policy.

471.     Plaintiffs are therefore entitled to a declaration from the Court that these provisions of the Quiznos franchise agreements signed by Plaintiffs are void and unenforceable.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

### TWENTY-THIRD CLAIM FOR RELIEF:
VIOLATIONS OF COLORADO'S CIVIL THEFT ACT,
(C.R.S. § 18-4-405, et seq.)

(As to Defendants QFA, QFII, QCE Finance, TQM, QIP,
TQSC II, QCE Holding, QZF, QCE Incentive, QCE,
Q Finance, QAFT, AFD, Source One, S&S Equip., Ba-Bing,
Chain Management, Kinetic Sourcing, Continental, CLG,
and John Does 1-50)

472.     Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

473.     In perpetrating the schemes alleged in this Complaint, Defendants QFA, QFII, QCE Finance, TQM, QIP, TQSC II, QCE Holding, QZF, QCE Incentive, QCE, Q Finance, QAFT, AFD, Source One, S&S Equip., Ba-Bing, Chain Management, Kinetic Sourcing, Continental, CLG, and John Does 1-50 (the "**Theft Defendants**") obtained property of

the Plaintiffs by theft, including but not limited to stealth withdrawals from Plaintiffs bank accounts.

474.    Plaintiffs have been damaged by that theft.

475.    Said property shall be restored to the rightful owners, namely Plaintiffs.  To the extent the Theft Defendants engaged in any subsequent transfer of the illegally obtained property to third parties, said transfer cannot divest Plaintiffs of their right to the return of such property.  Any such transfer by the Theft Defendants was done in bad faith and with express knowledge of the illegal source of the property.

476.    Pursuant to C.R.S. § 18-4-405, Plaintiffs are entitled to recover damages of three times the amount of the actual damages sustained by them as well as reasonable attorneys' fees incurred in obtaining relief from the Theft Defendants.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

### TWENTY-FOURTH CLAIM FOR RELIEF:
CONSPIRACY TO COMMIT CIVIL THEFT IN VIOLATION OF
COLORADO'S CIVIL THEFT STATUTE
(C.R.S. § 18-4-405, et seq.)

(As To All Defendants)

477.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

478.    As set forth in the Twenty-Third Claim for Relief, the Theft Defendants obtained Plaintiffs' property by theft, by means including but not limited to stealth withdrawals from Plaintiffs' bank accounts.

479.    The Theft Defendants agreed and conspired with each other as well as with Defendants Rick Schaden, Dick Schaden, Meyers, Shaffer, the Cervantes Defendants, System Services, Services Group, and McLane to commit the civil theft.

480.    The agreement was furthered by one or more unlawful, overt acts intentionally performed by the conspirators, including but not limited to making, approving and/or ordering the illegal withdrawal of funds, and making, approving and/or ordering the disposition and disbursement of the illegally withdrawn funds.

DMWEST #9515037 v1

481.    As a direct and proximate result of this conspiracy, Plaintiffs have been damaged in amounts to be proven at trial.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

### <u>TWENTY-FIFTH CLAIM FOR RELIEF</u>:
AIDING AND ABETTING CIVIL THEFT IN VIOLATION OF
COLORADO'S CIVIL THEFT STATUTE
(C.R.S. § 18-4-405, <u>et seq</u>.)

(As to All Defendants)

482.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

483.    As set forth in the Twenty-Third Claim for Relief, the Theft Defendants obtained Plaintiffs' property by theft, by means including but not limited to stealth withdrawals from Plaintiffs' bank accounts.

484.    Each Defendant that accepted or misspent Plaintiffs' property aided and abetted in the commission of the civil theft.

485.    Each Defendant that accepted or misspent Plaintiffs' property knowingly participated in and provided substantial assistance towards the civil theft by, among other things, approving or ordering the withdrawals, and or receiving or spending the funds from the illegal withdrawals.

486.    These Defendants knowingly participated in and provided substantial assistance towards the civil theft by, among other things, misrepresenting and otherwise hiding the purpose and legality of the stealth withdrawals.

487.    As a direct and proximate result of Defendants' aiding and abetting, Plaintiffs have been damaged in amounts to be proven at trial.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

DMWEST #9515037 v1

**TWENTY-SIXTH CLAIM FOR RELIEF**:
TRANSFERS MADE IN VIOLATION OF COLORADO'S
UNIFORM FRAUDULENT TRANSFER ACT
(C.R.S § 38-8-101 et seq.)

(As to Defendants, QFA, QFII, QCE Finance, TQM, QIP, TQSC II,
QCE Holding, QZF, QCE Incentive, Q Finance, QAFT, The
Cervantes Defendants, Rick Schaden, Dick Schaden, Meyers,
Shaffer, and John Does 1-50)

488.   Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

489.   As alleged with specificity in this Complaint in paragraphs 303-317, in or about 2005 and 2006, Defendants QFA, QFII, QCE Finance, TQM, QIP, TQSC II, QCE Holding, QZF, QCE Incentive, QCE, Q Finance, QAFT, The Cervantes Defendants, Rick Schaden, Dick Schaden, Meyers, Shaffer (the "**Fraudulent Transferors**") caused Quiznos to issue more than $870 million debt and shortly thereafter caused a substantial portion of the proceeds from that $870 million debt to be transferred as member distributions to the Cervantes Defendants, Rick Schaden, Dick Schaden, Meyers, Shaffer, and John Does 1 – 50 (the "**Fraudulent Transferees**").

490.   The above-described member distributions were made with the actual intent to defraud Plaintiffs, who were and are creditors of the Fraudulent Transferors within the meaning of C.R.S. § 38-8-101 et seq.

491.   In particular, as alleged with specificity in this Complaint in paragraph 328, the member distributions

(a)     were made to the Fraudulent Transferees who were corporate insiders;

(b)     were actively concealed from Plaintiffs;

(c)     were made after the Fraudulent Transferors had been threatened with lawsuits concerning the schemes alleged in this Complaint;

(d)     occurred shortly after the Fraudulent Transferors incurred a substantial debt;

(e)     were comprised of substantially all of the Fraudulent Transferors' assets,

(f)     were made without the Fraudulent Transferors receiving any reasonably equivalent consideration in return for the transfers; and

     (g)     caused the Fraudulent Transferors to become insolvent or nearly insolvency after the transfer was made.

492.    Plaintiffs discovered the above described fraudulent transfers less than one year ago in late 2012 and could not have reasonably discovered such transfers at any earlier time.

493.    Plaintiffs have been damaged by the above described fraudulent transfers.

494.    Pursuant to C.R.S. § 38-8-108, Plaintiffs are entitled to avoidance of the above-described fraudulent transfers to the extent necessary to satisfy Plaintiffs' claims alleged in this Complaint, as well as an attachment or other provisional remedies against the assets transferred in accordance with Colorado law, including but not limited to an injunction against further disposition by the Fraudulent Transferees of the money fraudulent transferred to them.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

**TWENTY-SEVENTH CLAIM FOR RELIEF**:
CONSPIRACY TO TRANSFER PROPERTY IN VIOLATION OF
COLORADO'S UNIFORM FRAUDULENT TRANSFER ACT
(C.R.S § 38-8-101 et seq.)

(As to Defendants, QFA, QFII, QCE Finance, TQM, QIP,
TQSC II, QCE Holding, QZF, QCE Incentive, Q Finance,
QAFT, AFD, Source One, S&S Equip., Ba-Bing, Chain
Management, Kinetic Sourcing, Continental, CLG, The
Cervantes Defendants, Rick Schaden, Dick Schaden, Meyers,
Shaffer, and John Does 1-50)

495.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

496.    As set forth in the Twenty-Sixth Claim for Relief, the Fraudulent Transferors fraudulently transferred Plaintiffs' property to the Fraudulent Transferees.

497.    Defendants Rick Schaden, Dick Schaden, Meyers, Shaffer, and the Cervantes Defendants directed, agreed and conspired with the Fraudulent Transferors to commit the fraudulent transfers.

DMWEST #9515037 v1

498.    The agreement was furthered by one or more unlawful, overt acts intentionally performed by the conspirators, including but not limited to making, approving and/or ordering the illegal property transfers.

499.    As a direct and proximate result of this conspiracy, Plaintiffs have been damaged in amounts to be proven at trial.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

<u>**TWENTY-EIGHTH CLAIM FOR RELIEF**</u>:
AIDING AND ABETTING TRANSFERS IN VIOLATION OF
COLORADO'S UNIFORM FRAUDULENT TRANSFER ACT
(C.R.S § 38-8-101 <u>et seq</u>.)

(As to Defendants, QFA, QFII, QCE Finance, TQM, QIP, TQSC II,
QCE Holding, QZF, QCE Incentive, Q Finance, QAFT, AFD,
Source One, S&S Equip., Ba-Bing, Chain Management, Kinetic
Sourcing, Continental, CLG, The Cervantes Defendants, Rick
Schaden, Dick Schaden, Meyers, Shaffer, and John Does 1-50)

500.    Plaintiffs hereby incorporate all other allegations from this Complaint as though set forth in full.

501.    As set forth in the Twenty-Sixth Claim for Relief, the Fraudulent Transferors fraudulently transferred Plaintiffs' property to the Fraudulent Transferees.

502.    Defendants that knew about, assisted in, and/or accepted the transfers of Plaintiffs' property aided and abetted in the commission of the fraudulent transfers.

503.    The Fraudulent Transferors that accepted the transfers of Plaintiffs' property knowingly participated in and provided substantial assistance towards the fraudulent transfers by, among other things, approving or ordering the transfers, and or receiving or spending the funds from the illegal transfers.

504.    These Defendants knowingly participated in and provided substantial assistance towards the fraudulent transfers by, among other things, misrepresenting and otherwise hiding the purpose and legality of the fraudulent transfers.

505.    As a direct and proximate result of Defendant's aiding and abetting, Plaintiffs have been damaged in amounts to be proven at trial.

WHEREFORE, Plaintiffs pray for the relief requested at the end of this pleading.

DMWEST #9515037 v1

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, seek the following relief:

(a)     An Order issuing a preliminary injunction enjoining Defendants and all others, known and unknown, from continuing to take illegal action as set forth in this Complaint, including forcing store closures.

(b)     An Order issuing a permanent injunction enjoining Defendants and all others, known and unknown, from continuing to take illegal action as set forth in this Complaint.

(c)     An Order issuing a preliminary injunction enjoining Defendants and all others, known and unknown, from further disposition of all monies and other things of value that were transferred from the Fraudulent Transferors to the Fraudulent Transferees as set forth in this Complaint.

(d)     An Order issuing a preliminary injunction enjoining Defendants and all others, known and unknown, from further disposition of all monies that were transferred from the Fraudulent Transferors to the Fraudulent Transferees as set forth in this Complaint.

(e)     An Order declaring the above-referenced provisions of the franchise agreements unconscionable and, therefore, unenforceable.

(f)     An Order declaring the franchise agreement illusory.

(g)     A Judgment awarding Plaintiffs compensatory, consequential, and statutory damages, including, without limitation, treble damages, Plaintiffs' loss of investment capital, loss of income, loss of assets and savings, treble actual damages, pre-judgment interest and post-judgment interest, and all costs allowed by law.

(h)     A Judgment ordering Defendants to disgorge their illegally-obtained profits.

(i)     A Judgment awarding Plaintiffs' attorneys fees as allowed by statute, contract, common law and otherwise.

(j)     An Order rescinding the franchise agreement.

(k)     An Order of restitution in an amount to be determined at trial.

DMWEST #9515037 v1

(l)      An Order that all monies fraudulently transferred from Quiznos to the Fraudulent Transferees be avoided to the extent necessary to satisfy any of the Plaintiffs claims alleged in this Complaint.

(m)    Non-economic damages.

(n)    Such other relief as the Court finds just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated this 19th day of December, 2012.

Respectfully submitted,

BALLARD SPAHR LLP

*s/  Jeffrey Cohen*
Jeffrey Cohen, Esq. #10876
Leslie Eaton, Esq. #17791
Scott Humphreys, Esq. #41723
Ballard Spahr LLP
1225 17th Street, Suite 2300
Denver, CO  80202
Phone:  303-292-2400
Facsimile:  303-296-3956
cohenj@ballardspahr.com
eaton@ballardspahr.com
humphreyss@ballardspahr.com

**ATTORNEYS FOR PLAINTIFFS**